NOAH WEBSTER *vs.* THE CAMBRIDGE FEMALE SEMI-
INARY, and others.

*Reservation of Power to Amend or Repeal charters—Private
corporation—Female seminary—Alteration of Charter—
Schools—Legislative power.*

The constitutional reservation of power to amend or repeal the
charters of corporations is a condition upon which a charter is
granted, and when the charter is accepted, the right of the Leg-
islature to exercise such power is as binding as if it were written
in the body of the charter itself, although the nature and char-
acter of the charter cannot be fundamentally changed.

Where a private corporation is chartered for the education exclu-
sively of females, a subsequent Act of the Legislature authoriz-
ing the trustees to lease to the county school commissioners so
much of the buildings and grounds as were not necessary for the
use of the seminary, is not such an amendment of the charter as
is inconsistent with the objects and purposes for which the sem-
inary was chartered, and unconstitutional, inasmuch as the neces-
sary effect and operation of the lease is not to change the semi-
nary into a mixed school for boys and girls.

The Legislature has the power to authorize the school commission-
ers, being a public corporation, to lease the buildings of an in-
corporated seminary for school purposes.

APPEAL from the Circuit Court for Dorchester County,
in Equity.

This appeal was taken from a decree of the lower
Court, (HOLLAND, J.,) dismissing the bill of complaint,
with costs to the defendants. By the Act of 1858, ch.
201, certain persons were incorporated by the name and
style of "The Cambridge Female Academy." By the
Act of 1872, ch. 396, the name of the Cambridge Female
Academy was changed to that of "The Cambridge
   13                    v. 78.

Female Seminary," and by the latter name, the corporation succeeded to all the rights, privileges, powers, property, and franchises, which it enjoyed, and was subjected to all the debts, engagements, contracts and liabilities for which it was responsible, under the name of "The Cambridge Female Academy." The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, MCSHERRY, BOYD, and BRISCOE, J.

*Charles Marshall,* for the appellant.

The point presented in this case is, whether or not the contract made between the trustees of the Cambridge Female Seminary, the trustees of the Cambridge Academy and the Board of County School Commissioners of Dorchester County, mentioned in the bill, effects such a change in the use of the property belonging to the Cambridge Female Seminary as is beyond the power of the trustees of the Cambridge Female Seminary to make without an amendment of its charter, and without the acceptance of that amendment by every stockholder. That the Cambridge Female Seminary is a private corporation, notwithstanding the fact that it has received benefits from the State, needs no argument. *State vs. Balto. & Ohio R. R. Co.,* 12 *G. & J.,* 440; *Boone on Corp., sec.* 9. The money when given by the State passed to the corporate uses of the corporation and none other. It did not give the State any control over the corporation that it did not possess before the donation.

Being then a private corporation, the question is whether the change in the use of the property contemplated by the contract in question, is such a change as amounts to a diversion of the property from the purposes contemplated by the charter of the Cambridge Female Seminary? Various changes in the use of the

property will be effected if the contract in question be carried into operation.

In the first place, the entire property is leased by the corporation to the Board of County School Commissioners, and the only use of the property retained by the Cambridge Female Seminary is in the shape of a condition attached to the lease by which the lessee is required to allow a part of the property to be used for the purposes of the Cambridge Female Seminary. This very stipulation carries with it of necessity the implication that the rest of the property is to be used for other purposes.

The school contemplated by the charter of the Cambridge Female Seminary was strictly a female school, a school for the education of girls, and the control of the appointments of the instructors in that institution, a most important feature of any seminary, and especially of a female seminary, was left in the hands of the trustees. The control of that matter by the terms of the contract, will be in the hands ultimately of the Board of County School Commissioners of Dorchester County, who in making their appointments, must be governed by all the laws of the State, which regulate them in the appointment of teachers of the public schools.

But the conversion of the female seminary into a mixed school of males and females, is a manifest departure from the primary object of incorporating the Cambridge Female Seminary. Their corporation was founded upon a recognition of a necessity and propriety of the separate education of the two sexes. Whether it was right or wrong, the money that was contributed by the stockholders for the purposes of the seminary was contributed by those who believed in the separate education of girls, and who were willing to invest their money to procure the means of such separate education. See *Dartmouth College vs. Woodward,* 4 *Wheaton,* 650.

The interference on the part of the Legislature of New Hampshire, under the statutes of that State, which was declared by the Supreme Court to be unconstitutional, was an interference with the government of the college and of the mode of conducting its operations. Statutes of the State provided for a different government and different mode of conducting the operations of the college from those provided for by the original charter. The Supreme Court held the changes to be essential and such as could not be made without the consent of the college.

A change from a girls' school to a mixed school of boys and girls, cannot be other than a radical change in the use of the property of the seminary. If this be so, it cannot be effected without the consent of every stockholder of the seminary.

The Legislature cannot under its power to amend, alter and repeal charters, convert one corporation into another essentially different corporation, without the consent of every member of the corporation. The power of the Legislature over public corporations, and its right to change those public corporations as the public interest may require, with or without the consent of the persons who compose those public corporations, is not denied. In the case, however, of a private corporation, the Legislature has no power to change these purposes and objects, and the use of its property, so as to apply it to a substantially different use from that contemplated by its charter, without the consent of every member of the corporation. *Sprigg vs. Western Telegraph Co., et al.*, 46 *Md.*, 70, 73, 78; *Green's Brice's Ultra Vires*, 77, note a; *Beach on Private Corp.*, sec. 41; *Zabriskie vs. The Hackensack and New York Railroad Co.*, 18 *N. J. Eq.*, 178; *Black vs. Delaware and Raritan Canal Co.*, 24 *N. J. Eq.*, 455.

In the present case the amendments to the charter of the Seminary attempted by the Act of 1892, ch. 350, is

a legislative recognition that the changes sought to be made by the contract in controversy, were changes that could not be made without alteration of the charter of the Seminary, to say nothing of an extension of the power of the Board of County School Commissioners, and that the Legislature possesses no power to make such an amendment without the consent of all stockholders, is abundantly established. See *Green's Brice's Ultra Vires*, 539, 543–4–5, *note; Stevens vs. Rutland and Burlington R. R. Co.*, 39 *Vermont*, 547; see also, *Sprigg vs. Western Telegraph Co.*, 46 *Md.*, 77–8.

*Bernard Carter*, (with whom were *Alonzo L. Miles*, and *Sewell T. Milbourne*, on the brief,) for the appellees.

The issues, as made up in this case, present three questions for adjudication:

1. Had the County School Commissioners the power to purchase stock in the Cambridge Female Seminary?

It is now the settled law of this State that one corporation may invest in the stock of other corporations as well as in any other funds, provided it be done *bona fide*, and with no sinister or unlawful purpose, and there be nothing in its charter or in the nature of its business that forbids it. *Booth, et al. vs. Robinson, et al.*, 55 *Md.*, 433.

Section 21 of Article 77 of the Code enumerates the powers and duties of the County School Commissioners, and further states that they *shall perform such other duties as may be necessary to secure an efficient administration of the public school system.*

The county school funds belong absolutely to the several counties in their respective corporate capacities, and are vested in the Board of County School Commissioners, to be applied by them in promotion of the policy for which the funds were intended, viz., public education. *School Comm'rs of Wicomico Co. vs. School Comm'rs*

*of Worcester Co.*, 35 *Md.*, 206; *Section* 20 *of Article* 77 *of the Code.*

In this case the purchase of the stock by the County School Commissioners, was made a condition precedent to the leasing of the seminary building, and was a part of the consideration for such lease. The school funds were applied to the purchase of the stock to enable the School Commissioners to obtain better accommodations for the public schools of Dorchester County, and to secure a more *efficient administration of the public school system,* and they therefore acted strictly within their statutory powers and duties. *Sec.* 21 *of Art.* 77 *of the Code.*

2. Was the contract or lease between the School Commissioners of Dorchester County, the trustees of the Cambridge Female Seminary, and the trustees of the Cambridge Academy valid?

The school law of the State clearly confers on the School Commissioners in the several counties, the power to purchase or lease school houses or buildings for school houses, and to apply the funds in their hands to pay for the same. *Sec.* 33 *of Art.* 77 *of the Code.*

The seminary trustees have not, on their part, alienated any portion of their property, which is necessary for corporate uses and purposes, in their dealings with the School Commissioners of Dorchester County or with the trustees of the Cambridge Academy. On the contrary, the said lease or contract is predicated upon the fact, that the entire seminary building is not necessary for the uses and objects of said seminary, and, in express terms it alleges that all and such portions of the said building, which are needed and required by said seminary, in connection with the higher education of females, are reserved for such use, and are retained under the supervision and control of the seminary trustees.

The case of the complainant proceeds and rests upon the notion, that the Cambridge Female Seminary which

was designed and founded to promote higher education among females, exclusively, (as is alleged,) has been by the trustees transmuted into a mixed school for boys and girls. This notion altogether misrepresents the action of the seminary trustees, and utterly ignores the plain and unmistakable meaning of the said lease or contract. The lease or contract carefully preserves the seperate identity of the seminary and the academy, and though the trustees of the seminary under common arrangements, in some respects, act concurrently with the trustees of the academy, the academy has not been and never will be absorbed in the seminary. According to what seems to be the appellant's notion, the said lease or contract has radically and fundamentally changed the character and objects of the seminary, so that what was heretofore a school for the promotion of higher female education, now has become a mixed school for boys and girls, under the supervision of the seminary trustees; that is to say, that the female seminary has become a school for the co-education of the sexes, and not that the male academy and the female seminary for the furtherance and promotion of the objects for which they were originally incorporated, have entered into mutual agreements without changing the said original objects, or affecting their original design. This notion ignores the undoubted fact that the male school is altogether under the academy trustees, while the female school is altogether under the seminary trustees. Two incorporated schools—one for the higher education of males, and the other for the higher education of females—may be located in the same building, without changing their original respective characters, and they may, for their mutual advantage, act concurrently, without sacrificing their identity or their original objects.

The appellant's counsel relies on the case of *Sprigg vs. The Western Telegraph Co. and others*, 46 Md., 68, to

show that, under the agreement between the school board, the academy and the seminary, the original nature and objects of the seminary are radically and fundamentally changed, so that the seminary has become a mixed school for boys and girls.

The alleged fact as to the change of the seminary from a female school to a mixed school for boys and girls, is utterly denied. An agreement between a male academy and a female seminary, to conduct their respective schools in concert, under arrangements for mutual advantage, does not change the female seminary into a mixed school for boys and girls. The two institutions move foward, *pari passu*, without the loss, by the one or the other, of its identity or its activity. The academy does not become absorbed in the seminary, any more than the seminary becomes absorbed in the academy. Affiliation between two or more schools, without any absorption, is not uncommon, even in cases where the schools are located in different towns, at a distance from each other. Because the academy and seminary employ, on economic grounds, the same teachers, does not change the one or the other into a mixed school. Is it meant that the academy and the seminary each become a mixed school of boys and girls, because they enter into concerted arrangements for mutual advantage, or does that result occur to the seminary alone? Because the male academy is located in the building which happens to belong to the seminary trustees, does that cause the seminary to absorb the academy? Cannot the two institutions occupy the same building, without the male becoming absorbed in the female school? If, after the seminary ceased to be a residence for its principal and teachers, and the space so cleared of occupation was in nowise needed by the seminary, would it not have been competent for the seminary trustees to lease the unoccupied portion of the building to the academy?

3. Is the Act of 1892, ch. 350, valid and operative? If the contract between the three corporations does not work a radical, revolutionary and fundamental change in the objects of the seminary, then the Act of 1892, in so far as it refers to a participation of the seminary trustees in the contract, is nothing more than declaratory of their right to enter into the same. The Act of 1892 was passed simply as a precautionary measure, and was asked of the Legislature as a safeguard. The very existence of the seminary and the cause of higher female education, in the community, depended on the maintenance of the contract between the three corporations. The valuable property, acquired through the benefactions of the State, could only be saved from individual appropriation and conversion by such maintenance. And while confident of the original validity of the contract, the parties concerned secured the Act of 1892, as an additional protection.

The Act of 1892 is not open to the objection that it will effect a radical and fundamental change in the original objects and purposes of the seminary corporation. If it does not work such a change, then the Act is to all intents and purposes, a valid and operative Act. *Sprigg vs. Western Telegraph Co., et al.,* 46 *Md.,* 67; *Mayor and Aldermen of Worcester vs. Norwich and Worcester Railroad Co.,* 109 *Mass.,* 103; *Sinking Fund Cases,* 99 *U. S.,* 720, 721; *Shields vs. Ohio,* 95 *U. S.,* 324; *Close vs. Glenwood Cemetery,* 107 *U. S.,* 475, 476; *Spring Valley Water Works vs. Schottler,* 110 *U. S.,* 347, 373; *Miller vs. The State,* 15 *Wall.,* 478; *Gray vs. Monongahela Nav. Co.,* 2 *Watts & S.,* 159; *Agricultural Branch R. R. Co. vs. Winchester,* 13 *Allen,* 32.

The Act simply confirms the contract complained of, and so far from working a revolutionary change in the constitution of the seminary, it is its chief safeguard and protection. This Act is and was intended to be a

help to the cause of higher education in Dorchester County. In so far as it assists in maintaining the contract between the three corporations, it deepens and strengthens the foundations of the seminary, and so gives a greater permanence to the cause of higher female education. If necessary for the support of the contract, it saves the valuable property which had been acquired through the beneficence of the State, from individual appropriation and conversion.

ROBINSON, C. J., delivered the opinion of the Court.

This case must be considered as one of more than ordinary importance. The right to alter, amend or repeal the charter of a private corporation is reserved in express terms by the Constitution of this State. And the question in this case involves the exercise of this power by the Legislature. The Cambridge Female Seminary was incorporated by the Act of 1858, with power to issue shares of capital stock to the amount of ten thousand dollars, for the purpose of erecting the necessary buildings for said institution. The trustees to be elected under the charter were authorized to employ teachers, fix their salaries, and *to do all other things necessary* for the proper conduct and management of the seminary. And upon the subscription of three thousand dollars to its capital stock, the State agreed to appropriate five hundred dollars annually to be expended, in the language of the Act, "for the *purposes of female education.*" By a subsequent Act, the Legislature appropriated the further sum of five thousand dollars to aid in the erection of additional buildings and the purchase of the necessary equipments for the school. Notwithstanding the liberal aid thus extended by the State, the seminary was not as successful as its promoters hoped and expected. It managed, however, it seems, to struggle along till 1890, when its principal resigned. Its revenues were not in

fact sufficient to pay the salaries of teachers and to meet the necessary current expenses. So the trustees were obliged to borrow money, and to mortgage the buildings and grounds to secure the payment of the loans. One of the mortgages was overdue, and there was no money in the hands of the trustees to pay either interest or principal. In this condition of affairs they made application to the School Commissioners of the county for financial aid and assistance. Of the one hundred and twenty shares of stock which had been subscribed by different persons, sixty-six shares remained unpaid, and, as the School Commissioners were in need of buildings for school purposes, they agreed to take these sixty-six shares, provided the trustees would lease to them for the use of the public schools, so much of the buildings and grounds as were not in fact necessary for the use of the seminary. This offer the trustees accepted, and the lease was accordingly executed. In addition to the subscription of the sixty-six shares of stock at forty dollars per share, the School Commissioners also agreed to pay to the trustees of the Seminary five hundred dollars annually, to be applied by them for the purposes of female education. And they also agreed to put and keep the building and grounds in proper repair, and to insure the buildings at their own expense. The principal and vice-principal of the consolidated schools, for so they are called by the lease, were to be elected by the trustees of the Female Seminary and the trustees of the Cambridge Academy, the latter being also parties to the lease, subject however, to the approval of the School Commissioners. Such are the terms of the lease, and these terms, so far as the seminary is concerned, would seem to be beneficial in every respect, for without the pecuniary assistance thus extended by the School Commissioners it could no longer be maintained as a school for the education of girls and young women.

Webster *vs.* Cambridge Female Seminary.

The complainant, however, is a stockholder of the defendant corporation, the Female Seminary, and this is a bill filed by him to restrain the parties from carrying into effect the terms of the lease, and to restrain the School Commissioners from taking possession of or using in manner the buildings and grounds belonging to the seminary, and further to have the lease itself declared to be null and void. And this relief ·he claims on the following grounds:

1st. Because the trustees had no power under the original charter to lease any part of the seminary buildings or grounds to the School Commissioners.

2nd. That the Legislature could not by the amendatory Act of 1892, ch. 350, confer this power upon the trustees.

3rd. That the School Commissioners had no power to subscribe to the capital stock of the defendant corporation, nor had they the power to become a party to the lease in question.

Whether the trustees had the power under the original charter to lease any part of the buildings or grounds is a question we shall not stop to consider. Be that as it may, the Legislature had the power, it is conceded, to alter and amend its charter, provided such amendment does not change *fundamentally the nature of the charter and the objects for which it was granted.* And this being so, the question comes to this, does the Act of 1892 change fundamentally the nature and character of the charter of the Female Seminary? Or, in other words, are its provisions inconsistent with the objects and purposes for which it was incorporated? And in considering this question it may not be amiss to refer briefly to the origin and object of the constitutional reservation to amend and repeal the charters of private corporations. In the well known *Dartmouth College Case,* the Supreme Court, after full consideration, decided that

Webster *vs.* Cambridge Female Seminary.

the charter of a private corporation, when accepted, was an executed contract between the State and the corporators, and, as such, was within the protection of the Federal Constitution, which forbids a State from passing any law impairing the obligation of contracts. And this being so, the Court held that the Legislature of New Hampshire could not by a subsequent Act, impair or interfere with the franchises and privileges granted to that corporation under its original charter. This decision and the grounds on which it is based, have been, it is true, the subject of a good deal of criticism, but the decision itself has been affirmed by the Supreme Court in a number of cases, and must now be considered as the settled law of this country. In his concurring opinion Mr. Justice STORY, however, suggested that the Legislature in chartering a private corporation might reserve the power to alter and amend it, and that the subsequent exercise of this power under such a reservation, would not be an impairment of the obligation of the contract within the meaning of the Constitution. And since that decision, this State and other States, by constitutional provision, or by general law, or by special Acts, have in express terms reserved the power to amend or repeal the charters of corporations. The object being, as we have heretofore said, to preserve to the State control over corporate grants, should the Legislature at any time deem the exercise of this power necessary and proper. *State vs. Northern Central Railway Company*, 44 *Md.*, 131. The reservation is therefore a condition upon which the charter is granted, and when it is accepted, the right to exercise the power is as binding as if it was written in the body of the charter itself. *Jackson, Governor, et al. vs. Walsh, et al.*, 76 *Md.*, 304. The right therefore of the Legislature to alter and amend the charter of the defendant corporation is not, and could not, be denied. At the same time we agree with the appellant

that it could not change fundamentally the nature and character of the charter itself.   It could not, under the guise of an amendment, substitute a new and different charter with distinct and different purposes, and oblige the stockholders to accept it.   Nor could it divest prop· erty rights acquired under the legitimate exercise of the powers granted.   Independent altogether of the contract clause of the Federal Constitution is the provision which declares that no one shall be deprived of his property without due process of law.

At the same time, the Legislature, it is equally clear, has the right to amend or repeal the franchises, privileges or immunities granted to the corporation.   If its property was exempted from taxation, this may be revoked. If its charter prescribed the rates of tuition to be charged, these could be changed.   If it prescribed the mode and manner by which the Seminary was to be managed and controlled, these and all other like rules and regulations may be altered and amended, as the Legislature may in its judgment determine.

In the *Sinking Fund Cases*, 99 *U. S.*, 700, 721, after reviewing the several cases in the Supreme Court, in which the extent of the reserved power to amend or repeal the charters of corporations had been considered, the Chief Justice says: "Giving full effect to the principles which have thus been authoritatively stated, we think it safe to say, that whatever rules Congress might have prescribed in the original charter for the government of the corporation in the administration of its affairs, it retained the power to establish by amendment."   And in that case it was held that, under this reserved power, Congress could lawfully enact that the corporation should set apart a portion of its earnings as a sinking fund for the payment of its debts to the United States.

Webster *vs.* Cambridge Female Seminary.

And in *Miller vs. The State*, 15 *Wallace*, 478, the Supreme Court held that where the charter of a corporation was subject to amendment or repeal in the discretion of the Legislature, it was competent for the Legislature to provide by law that a municipality should have the right to elect seven directors of a railroad company in place of four, the number which it had been originally empowered to elect, though such change resulted in giving the majority of the board to the municipality. And in answer to the argument, that the right to elect all of the directors, except four, had become vested in the stockholders owning a majority of the shares, and that the amendatory Act giving to the city the power to elect seven impaired that vested right, Mr. Justice CLIFFORD said: "The Court is of an entirely different opinion, as the Legislature, in conceding that right, made the concessions subject to the reserved power to alter or repeal as ordained in the Constitution of the State and the several statutes mentioned, which clearly gives to the Legislature the power to augment or diminish the number or to change the apportionment as the ends of justice or the best interests of all concerned may require."

So tested by these well settled principles we do not see on what grounds the amendatory Act of 1892 can be said to change materially, or to be in any manner inconsistent with, the objects and purposes for which the Seminary was chartered. It merely authorizes the trustees to lease to the School Commissioners so much of the buildings and grounds as were not necessary for the use of the Seminary. The property belonging to the Seminary was already encumbered with mortgage debts, which the trustees were unable to discharge; and besides they were without the means necessary to maintain it as an institution for purposes of female education. By the contract which the amendatory Act authorized the trustees to make, the mortgage debts were paid with the money

furnished by the School Commissioners, and the annual rental to be paid by them for the use of part of the buildings and grounds enabled the trustees to maintain the Seminary for the objects and purposes for which it was incorporated.

The argument, however, is that the necessary effect and operation of the lease in question was to change the seminary which was chartered for the *education of females, into a mixed school for boys and girls.* We agree with the appellant that the defendant corporation was chartered for the education exclusively of girls and young women. That such was its object and purpose is plain we think not only from the title of the Act of incorporation, but from every provision in the charter itself. It was so understood and accepted by the corporators themselves, and it was so conducted and managed down to 1890, when the lease was made, and it was for the purposes of female education that the State agreed to appropriate annually the sum of five hundred dollars. But it does not seem to us that the lease itself can by any fair rule of construction be held to change the seminary into a mixed school for boys and girls. The buildings were, it seems, larger than actually necessary for the seminary, part of them being occupied as residences for the teachers, and in the lease are reserved in express terms ample accommodations for the use of the seminary. And, as we construe it, the lease simply means that the School Commissioners shall be permitted to use and occupy part of the buildings and grounds for public school purposes.

The proof in the record shows, it is true, that the buildings have been used in a manner not warranted by the terms of the lease, as we have construed it. Instead of reserving and using part of the buildings for the exclusive education of females, the girls of the seminary and the boys and girls attending the public schools

occupy, it appears, the same room, with an aisle, merely, between, and recite to the same teachers in the same class. In the face of such facts as these, it can hardly be said that the Seminary is conducted as a school exclusively for the education of females, such as was contemplated by the defendant's charter.

The relief prayed, however, is not on the ground that the trustees have permitted the use of the buildings in a manner not warranted by the lease, but upon the ground that they had no power, either under the original charter or the amendatory Act of 1892, to lease any part of the buildings to the School Commissioners, even though they did reserve suitable and necessary accommodations for the exclusive use of the Seminary. It was filed upon the theory that the trustees had no power whatever to lease any part of the buildings, and the relief prayed is to enjoin the parties from carrying into effect the terms of the lease, and to prevent the trustees of the Cambridge Academy, or the School Commissioners from taking possession of, or using in any manner, the property belonging to the Female Seminary. There is a general prayer, it is true, "for other and further relief," but under such a prayer the complainant is not entitled to relief beyond the general scope and object of the bill. *Fenby, et al. vs. Johnson*, 21 *Md.*, 106. Whether the Legislature has the power, by amending the charter of the defendant, to convert the Seminary, chartered originally for the exclusive education of females, into a mixed school for boys and girls, is a question not presented by the pleadings in this case, and in regard to which we are not to be understood as expressing any opinion. What we mean to decide is that the Legislature had the power, by the amendatory Act of 1892, to authorize the trustees to execute the lease in question, and that the lease so executed does not in itself change,

or authorize the trustees to change, the Seminary into a mixed school for boys and girls.

Now, as to the power of the School Commissioners to subscribe to the stock of the Female Seminary, and to lease part of the buildings and grounds for public school purposes, we have but a word to add. The Code provides that they shall have the general supervision and control of all schools in their respective counties; they shall build, repair, and furnish school houses; they shall fix the salaries of teachers; they shall purchase and distribute text books, and "*shall perform such other duties as may be necessary to secure an efficient administration of the public school system.*" The powers thus conferred are broad and comprehensive. Whether they are broad enough to authorize them to lease buildings for school purposes it is quite unnecessary, for the purposes of this case, to decide. Be that as it may, they are *public*, and *not private corporations*, and, being *public corporations*, the Legislature had beyond all question, the power to authorize them to lease the buildings of the Seminary for school purposes. It follows from what we have said that the decree below must be affirmed.

*Decree affirmed.*