473 A.2d 892

STATE of Maryland et al.

v.

The GOOD SAMARITAN HOSPITAL OF MARYLAND, INC.

No. 100, Sept. Term, 1983.

Court of Appeals of Maryland.

April 11, 1984.

312

Howard L. Sollins, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., and Randall M. Lutz, Asst. Atty. Gen., Baltimore, on the brief), for appellants, State of Md. and Adele Wilzack, Secretary, Md. Dept. of Health and Mental Hygiene.

Richard Bloch, Baltimore (Reuben Shiling, Richard M. Weintraub and Shiling & Bloch, P.A., Baltimore, on the brief), for appellants, Maryland Podiatry Ass'n and Anthony J. Costa, D.P.M.

John C. Evelius, Baltimore (Gallagher, Evelius & Jones, Baltimore, on the brief), for appellee.

Werner Strupp, Washington, D.C., on the brief, for amicus curiae, American Podiatry Ass'n.

John F. King, Jeanette A. Plante and Anderson, Coe & King, Baltimore, on the brief, for amicus curiae The Medical and Chirurgical Faculty of Maryland.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and W. ALBERT MENCHINE, Retired, Specially Assigned Judge.

MURPHY, Chief Judge.

The primary question in this case is whether Maryland Code (1982), § 19–351(b) of the Health-General Article (the podiatry statute), as applied to The Good Samaritan Hospital of Maryland, Inc. (Good Samaritan), violates Article I, § 10 of the United States Constitution which prohibits any state from enacting "any . . . Law impairing the Obligation of Contracts."

Section 19–351(b) provides:

"(b) *Podiatrists.*—(1) A hospital or related institution that provides medical or surgical care of the foot, other than incidental care, shall include, in its bylaws, rules, or regulations, provisions for use of facilities by and staff privileges for qualified podiatrists.

(2) The hospital or related institution may restrict use of facilities and staff privileges by podiatrists to those podiatrists who meet the qualifications that the hospital or related institution sets for granting those privileges."

The podiatry statute thus requires that any hospital which offers medical or surgical foot care must permit qualified podiatrists to obtain staff privileges and to use the hospital's facilities. While the statute prohibits such hospitals from categorically excluding all podiatrists, it permits the hospital to determine those individuals whom it will accept as "qualified podiatrists." [1]

---

1. Code (1981), § 15–101(f) of the Health Occupations Article states that to "[p]ractice podiatry means to diagnose or surgically, medically, or mechanically treat any ailment of the human foot." Specifically excluded from the statutory definition of podiatry are arthrodesis (surgical fusion) of two or more tarsal (instep) bones, complete tarsal osteotomy (bone cutting), or administration of an anesthetic, other than a local anesthetic.

A podiatrist is an individual who has received a Doctor of Podiatric Medicine degree (D.P.M.) and is currently fully licensed to practice podiatry. Joint Commission on Accreditation of Hospitals, *Accreditation Manual for Hospitals,* 209 (1982). Qualifications for licensure as a podiatrist in Maryland are set forth in Code (1981), § 15–302 of the Health Occupations Article.

The term "staff privileges" generally refers to the authority granted to a physician or other medical professional by a hospital board of

## I.

Good Samaritan filed a declaratory judgment action in the Circuit Court for Baltimore City, challenging the constitutionality of the podiatry statute as being in violation of (1) the Contract Clause of the Federal Constitution, (2) the Due Process and Equal Protection Clauses of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights and (3) § 33 of Article III of the Constitution of Maryland.[2]

The evidence at trial established that Good Samaritan is a private, nonprofit community hospital built and operated pursuant to a testamentary bequest of Thomas O'Neill, a Catholic philanthropist, who died in 1919. O'Neill's will provided for the establishment of a corporation to use his bequest "for the purposes of erecting and maintaining a hospital" in a designated location. It also directed that "the policy, supervision and general direction and management of [the] hospital is at all times to be subject to the control of the ... Board of Trustees." In 1920, the State granted Good Samaritan a corporate charter pursuant to the general corporation law; the charter enumerated, as the hospital's corporate purpose, "the acquiring of land and ... other property and erecting and maintaining a hospital."

As shown by the evidence, Good Samaritan is a 259-bed hospital constructed in 1967–1968. It has a medical staff of 375 health care professionals. Among its many services, the hospital renders medical and surgical care of the foot through general, vascular and orthopedic surgeons. Of these physicians, five are hospital-based orthopedic specialists and thirty-five provide medical care and treatment

---

trustees to admit inpatients and to utilize hospital facilities. *See* D.J. Tennenhouse, *Attorneys Medical Deskbook 2d* 118 (1983); *Stedman's Medical Dictionary* 1325 (24th ed. 1982).

**2.** Section 33 provides, in pertinent part: "[T]he General Assembly shall pass no special Law, for any case, for which provision has been made, by an existing General Law."

related to the foot. These physicians hold full staff privileges at the hospital.

The evidence further showed that there are 150 to 200 podiatrists in Maryland. While a number of hospitals in the State grant full staff privileges to podiatrists, Good Samaritan grants only limited out-patient staff privileges to these individuals. Good Samaritan declined to amend its bylaws to conform to the podiatry statute's requirements. The Vice-Chairman of Good Samaritan's Board of Trustees testified as to the reasons for the Board's decision:

"[T]he board of trustees ... felt that since we had a charter from the State to act as a medical care institution we had the right to in our own bylaws ... talk about the kind of care and how we would deliver it. Our hospital is a very busy institution. We didn't feel that the facilities there were capable of taking on other services without infringing upon those that were already established. We felt that the State was intruding in the board room, that we have an intrinsic right to have our hospital deliver the care in the manner that it does and in the areas that it does and so the board voted against changing the bylaws to allow podiatrists to have full medical privileges on the staff."

Other evidence adduced on behalf of Good Samaritan tended to establish that foot care at the hospital, as presently provided by physicians holding staff privileges, was entirely adequate; that podiatrists are, therefore, not needed to provide foot care at Good Samaritan; that the hospital's surgical facilities are presently scheduled to capacity, with a substantial waiting period for elective surgery; that the addition of podiatrists to Good Samaritan's staff would require more ancillary personnel and more operating rooms, as well as an enlargement of the hospital's present building; and that Good Samaritan could not increase its foot care facilities without infringing upon current hospital services and overtaxing its resources.

■ The trial court (Grady, J.) concluded that the podiatry statute constituted an impermissible use of the State's police power in violation of the Contract Clause of the Federal Constitution, resulting in an unconstitutional taking of the use of the hospital's property. The court correctly noted that under *Robert T. Foley Co. v. W.S.S.C.,* 283 Md. 140, 389 A.2d 350 (1978), a claim that a legislative enactment invalidly impairs contractual obligations implicates a three-pronged test—first, whether a contract exists; second, whether an obligation under the contract was changed; and third, if it was, whether the change unconstitutionally impairs the contractual obligation. Applying the *Foley* test, the trial court first held that Good Samaritan's charter constituted a contract with the State. In next considering whether the podiatry statute changed an obligation under the contract, the court, relying upon *Levin v. Sinai Hosp. of Balto.,* 186 Md. 174, 46 A.2d 298 (1946), said that a private, nonprofit hospital has "the basic right . . . to manage its internal affairs with particular reference to selecting its staff." The court, after noting that a right of management and control of corporate assets is vested in the corporation as one of the incidents of ownership, determined that the requirements of the podiatry statute "materially affect the Hospital's right to manage its affairs," thus satisfying the second prong of the *Foley* test. The court next considered *Foley's* final prong, *i.e.,* whether the podiatry statute "unconstitutionally impairs the contract obligation." In holding that it did, the court said that the podiatry statute was not predicated upon the abatement of a nuisance or upon an immediate threat to public health and safety. It therefore concluded that because the statute affirmatively required Good Samaritan to spend its resources *pro bono publico,* an unconstitutional taking of the use of the hospital's property had occurred, thereby impairing the contract obligation, even though Good Samaritan was not deprived of the substantial enjoyment of its property.

The State and other parties defendant in the case appealed to the Court of Special Appeals from the declaratory

judgment entered by the trial court.[3] We granted certiorari prior to consideration of the appeal by the intermediate appellate court to consider the issues of public importance raised in the case.

## II.

Read literally, the Contract Clause appears to proscribe any impairment. The Supreme Court has made clear, however, that the constitutional prohibition is not absolute. Finding technical impairment is just a first step toward resolving the more difficult question of whether the impairment is permitted by the Constitution. *See, e.g., Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

It is well settled that the Contract Clause must be accommodated to the inherent police power of a sovereign state to protect the general welfare of its people. *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *East New York Sav. Bank v. Hahn,* 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945); *Edgar A. Levy Leasing Co. v. Siegel,* 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922). "The legislature cannot bargain away the police power of a State." *Stone v. Mississippi,* 101 U.S. 814, 817, 25 L.Ed. 1079 (1880). Accordingly, a reservation of that power is "an implied condition of every contract." *East New York Sav. Bank, supra,* 326 U.S. at 232, 66 S.Ct. at 70.

---

**3.** In addition to the State, the Secretary of the Department of Health and Mental Hygiene and the Maryland Podiatry Association were named defendants. Anthony J. Costa, a podiatrist who held limited privileges but was denied full privileges at Good Samaritan, intervened as a co-respondent. Dr. Costa's grant of staff privileges entitled him to treat his patients in Good Samaritan's outpatient department, but he was not authorized to admit inpatients or to perform invasive surgery at the hospital.

■ The doctrine that a state's police power is paramount to contract rights applies regardless of whether the rights in question are between individuals, between an individual and a state or between a corporation chartered by a state and the chartering state. The Supreme Court established very early that a state charter is a contract and that an agreement to which a state is a party comes within the protection of the Contract Clause. *See, e.g., Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819); *New Jersey v. Wilson,* 11 U.S. (7 Cranch) 164, 3 L.Ed. 303 (1812); *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810). The Court established further that "a corporate charter to operate a particular business in a particular manner does not exempt the corporation from the requirement that it obey state legislation touching corporate activities." *Helvering v. Northwest Steel Mills,* 311 U.S. 46, 51, 61 S.Ct. 109, 112, 85 L.Ed. 29 (1940).

■ Yet the Contract Clause does "impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel, supra,* 438 U.S. at 242, 98 S.Ct. at 2721. As the Court there stated: "Despite the customary deference courts give to state laws directed to social and economic problems, '[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.' " 438 U.S. at 244,[4] 98 S.Ct. at 2722, quoting in part *United States Trust Co., supra,* 431 U.S. at 22, 97 S.Ct. at 1517.

■ Where, as here, a contract exists between the State and Good Samaritan, the threshold inquiry is "whether the

---

4. In *United States Trust Co., supra,* the Court held that a state could not retroactively alter a statutory bond covenant relied upon by bond purchasers. In *Allied Structural Steel, supra,* the Court invalidated a state statute requiring an employer that closed its office in the state to pay a "pension funding charge" where its pension fund was insufficient to provide full benefits for all employees having at least 10 years' seniority.

state law has, in fact, operated as a substantial impairment of a contractual relation." *Energy Reserves Group, supra,* 459 U.S. at ———, 103 S.Ct. at 704–705; *Allied Structural Steel, supra,* 438 U.S. at 244, 98 S.Ct. at 2722. The severity of the impairment determines whether the action which impairs the contractual obligation has been effected in a constitutional manner. *Allied Structural Steel, supra,* 438 U.S. at 244, 98 S.Ct. at 2722. Past regulation of the industry is a factor to be considered in assessing the extent of the impairment. *Energy Reserves Group, supra,* 459 U.S. at ———, 103 S.Ct. at 705. Our cases have recognized and applied these principles. *Automobile Trade Ass'n v. Ins. Comm'r,* 292 Md. 15, 437 A.2d 199 (1981); *Robert T. Foley Co. v. W.S.S.C.,* 283 Md. 140, 389 A.2d 350 (1978).

The appellants contend that because the podiatry statute does not change or impair any contractual obligation arising out of Good Samaritan's incorporation, the second prong of *Foley* was not satisfied and thus no contract clause violation occurred in this case. We agree. At most, the contract between the State and Good Samaritan involves the hospital's charter and the then existing general corporation law under which the hospital was chartered. *See Dennis v. City of Rockville,* 286 Md. 184, 189–90, 406 A.2d 284 (1979) (statutes in existence at the time of making the contract are part of the agreement). Nothing in the provisions of Good Samaritan's charter or in the general corporation law in existence in 1920 purports to inhibit the State from enacting laws impacting upon the hospital's activities or upon the power of the board of trustees to select the hospital's professional staff or to pass or not pass bylaws for the hospital's governance. Thus, no provisions exist in the hospital's contract with the State which would permit Good Samaritan to conduct its activities without regard to the enactment of legislation under the State's police power to protect and promote the general welfare of the people of Maryland. On the contrary, § 48 of Article III of the Constitution of Maryland explicitly provides that corporate charters are "subject to repeal or modification [and] may be altered, from

time to time, or be repealed."[5] Moreover, Maryland Code (1975), § 2–103 of the Corporations and Associations Article, dealing with general powers of corporations, authorizes such bodies in subparagraph (15) to adopt, alter and repeal by-laws if "not inconsistent with law or [the corporation's] charter for the regulation and management of [the corporation's] affairs." To the same effect see § 2–110(a). These constitutional and statutory provisions are plain manifestations of the well-settled principle that a corporation holds its charter subject to the constitutional exercise of the State's reserved police power to legislate in the public interest. *See, e.g., Insurance Comm'r v. Blue Shield,* 295 Md. 496, 456 A.2d 914 (1983); *Blum v. Engelman,* 190 Md. 109, 57 A.2d 421 (1948).

■ In determining that Good Samaritan's contract with the State contains no obligation impaired by enactment of the podiatry statute, we have considered Good Samaritan's argument that our decision in *Levin v. Sinai Hosp. of Balto.,* 186 Md. 174, 46 A.2d 298 (1946), vested a right in the hospital as a private entity to manage and control the institution and to select its professional staff. That case involved a suit by a physician excluded from staff privileges in the hospital. We there recognized that "a private hospital has the right to exclude any physician from practicing therein, and such exclusion rests within the sound discretion of the managing authorities." 186 Md. at 179–80, 46 A.2d 298. Our holding,

---

**5.** Similarly, Maryland Code (1975), § 1–102(e) provides that "[t]he charter of every corporation formed before June 1, 1951, which is subject to repeal or modification, and the charter of every corporation formed under this article is subject to repeal or modification by public general law of the General Assembly."

Of course, these constitutional and statutory provisions do not confer power upon the legislature to deprive the corporation of its property without due process of law or the payment of just compensation. *See United R. & E. Co. v. M. & C.C. of Balto.,* 127 Md. 660, 96 A. 880 (1916). Nor do these provisions permit legislation that would destroy or fundamentally change the corporation's purpose. *See Board of Regents v. Trustees,* 206 Md. 559, 112 A.2d 678 (1955); *Crisfield v. Public Service Comm.,* 183 Md. 179, 36 A.2d 705 (1944); *Webster v. Cambridge Seminary,* 78 Md. 193, 28 A. 25 (1893).

however, was qualified by the further statement that a private hospital's freedom to accept some applicants while rejecting others exists only "[i]n the absence of statute." *Id.* at 180, 46 A.2d 298. One clear principle to be gleaned from *Levin* is that the hospital's managerial prerogatives in this regard are subject to a proper exercise of the State's police power.

Equally misplaced is the hospital's reliance on *Board of Regents v. Trustees,* 206 Md. 559, 112 A.2d 678 (1955). In that case, a statute transferred the power of management and control from one corporation to another. After recognizing that a charter is a contract between the State and the incorporators, we said that such a transfer, under the circumstances, was arbitrary and unreasonable in that it defeated or fundamentally changed the corporation's purpose and was therefore beyond the reserved power of the legislature under § 48 of Article III of the Maryland Constitution. In so holding, we said that the character of the alteration is "[t]he nub of the controversy," *id.* at 569, 112 A.2d 678, and that the statute, in effect, amounted to "a nullification of the charter, without any justification arising out of the police power." *Id.* at 574, 112 A.2d 678.

It is readily apparent that the provisions of the podiatry statute do not defeat or fundamentally change Good Samaritan's corporate purpose to erect and maintain a hospital. As earlier observed, there is simply *no* impairment of any contractual obligation in this case. Indeed, the statutory intrusion into the management authority of the hospital's board is minimal, at best. The statute does not mandate that the hospital provide additional foot care. The hospital retains its authority to determine which, if any, podiatrists it may deem "qualified" for staff privileges. All that the statute requires is a hospital bylaw or regulation permitting use of hospital facilities by and staff privileges for qualified podiatrists. No violation of the Contract Clause is, therefore, involved in this case. *Compare Md. Medical Service v. Carver,* 238 Md. 466, 209 A.2d 582 (1965), and *see Exxon*

*Corp. v. Eagerton,* —— U.S. ——, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983).

## III.

■ In view of the trial court's disposition of the case on Contract Clause grounds, the substantive due process, equal protection and "special law" contentions raised and presented by Good Samaritan were not decided. Under Maryland Rule 885, we ordinarily will not decide any question not passed upon by the trial court except where necessary or desirable for the guidance of the circuit court or to avoid the expense and delay of another appeal. Since our grant of certiorari encompassed these additional issues, and as they have been briefed and argued by the parties, we shall state our views as to each unresolved question.

### (A)
### *Substantive Due Process and Taking of Property*

■ We find no merit in Good Samaritan's argument that the podiatry statute constitutes an impermissible "taking" of the hospital's incorporeal rights, internal management and property in violation of the due process clauses of the fourteenth amendment and Article 24 of the Maryland Declaration of Rights.[6] It is true, of course, that the State cannot, under the guise of exercising its police power, take private property for public use without payment of just compensation. *Md.-Nat'l Cap. P. & P. Comm'n v. Chadwick,* 286 Md. 1, 405 A.2d 241 (1979). For government restriction upon the use of property to constitute a "taking" in the constitutional sense, so that compensation must be paid, the

---

**6.** The due process clause of the fourteenth amendment provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law." Article 24 of the Maryland Declaration of Rights provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

restriction must be such that it essentially deprives the owner of all beneficial uses of the property. *Governor v. Exxon Corp.,* 279 Md. 410, 436–37, 370 A.2d 1102 (1977), *aff'd* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). In this regard, the restriction imposed must be such that the property cannot be used for any reasonable purpose, and it is not enough to show that the action results in substantial loss or hardship. *Id.* at 437, 370 A.2d 1102 and cases there cited. Of course, a fair exercise of the police power requires a public purpose and means which bear a real and substantial relation to public health, morals, safety and welfare of the citizens of the State. *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 384 A.2d 748 (1978); *Bowie Inn v. City of Bowie,* 274 Md. 230, 335 A.2d 679 (1975). We have consistently upheld regulatory statutes which may have, as an incidental effect, the diminution of value of property. *Chadwick,* 286 Md. at 9, 405 A.2d 241, and cases there cited. We noted in that case that a regulation which prohibits a beneficial use of private property constitutes a fair exercise of the police power if the public interest generally requires it and the regulation is reasonably necessary to achieve the public goal without being arbitrary, capricious or unduly oppressive. *Id.* at 9, 405 A.2d 241. *See also PSC v. Highfield Water Co.,* 293 Md. 1, 441 A.2d 1031 (1982).

As we stated in *Governor v. Exxon Corp., supra,* 279 Md. at 424, 370 A.2d 1102, the Court's function is very limited when it reviews regulatory legislation alleged to be violative of the due process clauses of the federal and state constitutions. We observed in that case, with abundant citation of authority, that the wisdom or expediency of a law adopted in the exercise of the police power is not subject to judicial review, and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported. Moreover, a statute enacted by the legislature in the exercise of the police power is presumed to be valid, so that if any state of facts reasonably can be conceived that would sustain the constitutionality of the statute, the existence of that state of facts as a basis for the

passage of the law must be assumed. *Edgewood Nursing Home, supra,* 282 Md. at 427, 384 A.2d 748. Therefore, one attacking the statute's validity has the burden of affirmatively and clearly establishing its invalidity. *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 300 A.2d 367 (1973).

■ The podiatry statute's purpose, plainly evident from its provisions, is to insure that a full range of foot care services offered by qualified podiatrists will be available to the public in hospitals throughout the State. The legislature could have recognized, as the evidence tended to demonstrate in this case, that only a sterile hospital environment affords adequate health safeguards, at least in some types of podiatric cases. It could have concluded that, absent legislation, hospitals would continue to deny podiatrists access to staff privileges in contravention of the public interest. Or, the legislature could have enacted the podiatry statute to promote economic competition between podiatrists and physicians in order to reduce patient costs. Attributing any one of these reasons to the legislature is plainly sufficient to sustain the statute against the hospital's due process challenge.

Notwithstanding Good Samaritan's protests that the podiatry statute has declared a "forfeiture" of its property and changed the "very nature" of the hospital, we hold that nothing in the statute even remotely resembles a "taking" in the constitutional sense. Quite simply, Good Samaritan has failed affirmatively to prove its substantive due process contentions in this case.

## (B)

### Equal Protection

■ Also lacking in merit is Good Samaritan's argument that the podiatry statute constitutes a denial of equal protection under the federal and state constitutions.[7] While

---

7. The equal protection clause of the fourteenth amendment prohibits any state from denying "to any person within its jurisdiction the equal protection of the laws."

recognizing that the legislature has wide power to draw classifications in its statutory enactments, the hospital says that the classification in § 19–351(b) is not rationally related to a legitimate state interest, as required by our cases. Good Samaritan maintains that the podiatry statute is based upon a "misclassification," in that hospitals are required to grant staff privileges only to podiatrists, who are but a subspecialty of health care professionals; that hospitals are not similarly required to grant staff privileges to other medical specialists, such as pediatricians, obstetricians or urologists; that there is no rational basis for compelling hospitals like Good Samaritan, which presently renders a full range of foot care services, to grant staff privileges to qualified podiatrists; and that this is particularly so since podiatrists now enjoy staff privileges at one-fourth of the hospitals in the State and there is no demonstrated need for podiatrists at Good Samaritan or similarly situated hospitals. The hospital urges us to conclude that no justification exists for singling out podiatrists from all other health care specialists for special benefits.

Our cases hold that where all persons who are in like circumstances are treated the same under the law, there is no deprivation of equal protection; but a law which operates upon some persons or corporations, and not upon others like situated or circumstanced, or in the same class, is invalid. *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 640, 458 A.2d 758 (1983). Where, as here, we are concededly dealing with the rational basis standard of review in determining whether the challenged enactment runs afoul of equal protection guarantees, the basic rules are as stated in *Montgomery Co. v. Fields Road,* 282 Md. 575, 579–80, 386 A.2d 344 (1978), quoting from *Lindsley v. National Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911):

---

The Maryland Constitution does not contain an express equal protection clause; the concept of equal protection is, however, embodied in Article 24 of the Declaration of Rights. *See Hornbeck v. Somerset Co. of Educ.,* 295 Md. 597, 616, 458 A.2d 758 (1983).

" '1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify . . . but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest on any reasonable basis, but is essentially arbitrary.' "

A statutory classification tested by the rational basis standard enjoys a strong presumption of constitutionality and a reasonable doubt as to its constitutionality is sufficient to sustain it. *Hornbeck, supra,* 295 Md. at 656–57, 458 A.2d 758.

 We have heretofore set forth a number of conceivable rational bases for the legislature's enactment of the podiatry statute. Considering all arguments presented by the hospital, we think it plain that the means chosen in § 19–351(b) are not wholly irrelevant to the achievement of the State's police power objectives in this case.

The fact that § 19–351(b) may benefit podiatrists does not mean that Good Samaritan has been denied equal protection of the law. As we observed in *Cider Barrel Mobile Home v. Eader,* 287 Md. 571, 579–80, 414 A.2d 1246 (1980), "that certain private interests may benefit from the restrictions placed upon the property of others does not establish that those restrictions are not in the public interest." Undoubtedly, a limited number of qualified podiatrists will benefit from hospital access provided by the statute. The legislature could find, however, as it obviously did, that this benefit was outweighed by the benefit to the public result-

ing from compliance with the provisions of the podiatry statute. Accordingly, we conclude that Good Samaritan did not carry its burden, by a clear and convincing showing, *see Hornbeck, supra,* 295 Md. at 657, 458 A.2d 758, that the classification drawn by § 19–351(b) is an arbitrary one, without any conceivable relationship to the public welfare. *See, generally, Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981); *Supermarkets Gen. Corp. v. State,* 286 Md. 611, 409 A.2d 250 (1979); *Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975); *Aero Motors v. Adm'r, M.V.A.,* 274 Md. 567, 337 A.2d 685 (1975).

## (C)
### *"Special" Legislation*

 Finally, we consider whether § 19–351(b) constitutes a "special" law in violation of Article III, § 33 of the Maryland Constitution. As the language of this provision (*supra,* n. 2) makes clear, a statute is only prohibited if it meets two conditions: (1) it must be a "special" law; and (2) there must be no provision for the matter in an existing general law. *Cities Service Co. v. Governor,* 290 Md. 553, 567, 431 A.2d 663, 671 (1981).

 We have defined a "special" law prohibited under § 33 as a law for special cases, "one that relates to particular persons or things of a class, as distinguished from a general law which applies to all persons or things of a class," *Prince George's Co. v. B. & O. R. Co.,* 113 Md. 179, 183, 77 A. 433 (1910), quoted in *Cities Service Co., supra,* 290 Md. at 567, 431 A.2d 663. This definition, however, does not provide a mechanical rule of thumb for deciding cases, because it depends on what is determined to constitute the "class." *Id.* Consequently, we have looked to the purpose of the constitutional prohibition in applying § 33 to determine whether an enactment affects less than an entire class and, therefore, meets the "special" law requirements. We have said that the purpose of § 33 is to prevent or restrict the legislature from passing private acts for the benefit of particular persons or individual cases. *Potomac Sand &*

*Gravel v. Governor,* 266 Md. 358, 293 A.2d 241, *cert. denied,* 409 U.S. 1040, 93 S.Ct. 525, 34 L.Ed.2d 490 (1972); *Montague v. State,* 54 Md. 481, 490 (1880). In addition, we have identified various influential considerations and factors, although no one of them is dispositive in all cases. *See Cities Service Co., supra,* 290 Md. at 569, 431 A.2d 663. One such consideration is whether the underlying purpose of the legislation is to benefit or burden a particular class member or members. *Beauchamp v. Somerset County,* 256 Md. 541, 549, 261 A.2d 461 (1970). Another is whether the statute identifies particular individuals or entities. *Reyes v. Prince George's County,* 281 Md. 279, 305, 380 A.2d 12 (1977). It is also pertinent to consider the substance and "practical effect" of a statute and not merely its form. *Beauchamp, supra,* 256 Md. at 549, 261 A.2d 461; *Littleton v. Hagerstown,* 150 Md. 163, 132 A. 773 (1926). If the statute serves as a vehicle to confer special advantages on, or to discriminate against, a particular individual or business, this too would be an influential factor. *Littleton, supra,* 150 Md. at 183, 132 A. 773. Other relevant considerations are the public need and public interest and the adequacy of the general law to serve them. *Jones v. House of Reformation,* 176 Md. 43, 55–58, 3 A. 728 (1939). In addition, in deciding whether a statute applies to an entire class or only to certain members of the class, we have considered whether the lines drawn by the legislature were arbitrary and without any reasonable basis. *Littleton, supra,* 150 Md. at 176, 132 A. 773.

■ Good Samaritan argues that § 19–351(b) is a "special" law because it benefits podiatrists, whom it characterizes as particular members of the class of all health care practitioners. It says that no other subclass of health care professionals has been afforded a statutory right to hospital staff privileges in Maryland. Furthermore, the hospital contends that the statute gives podiatrists an unfair advantage over all other health care professionals who specialize in foot care. It asserts that there is no discernible reasonable basis for the legislatively drawn distinction. And, it

argues that there is no public need or public interest adequate to warrant such a legislative mandate.

As already observed, the podiatry statute assures the availability of adequate podiatric services to all hospital patients. It accomplishes its purpose by imposing an equal burden on all hospitals which offer foot care. Correspondingly, the statute benefits all podiatrists equally. To constitute "special" legislation under a § 33 analysis, § 19–351(b) would have to place a disproportionate burden on a single hospital or confer a disproportionate benefit on a single podiatrist. Such is not the podiatry statute's effect. It clearly is not a special law; it does not meet the first condition of § 33 of Article III of the Maryland Constitution. All hospitals offering foot care and all podiatrists are treated alike.

JUDGMENT VACATED; CASE REMANDED FOR ENTRY OF A DECLARATORY JUDGMENT NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.