559 A.2d 822

**BOARD OF COUNTY COMMISSIONERS OF CALVERT COUNTY, Maryland**

v.

**EAST PRINCE FREDERICK CORPORATION.**

No. 1654, Sept. Term, 1988.

Court of Special Appeals of Maryland.

June 30, 1989.

Certiorari Granted Nov. 13, 1989.

Mary M. Krug (Allen S. Handen and Handen and Krug, on the brief), Prince Frederick, for appellant.

Eric S. Slatkin (Karl G. Feissner, on the brief), Burtonsville, for appellee.

Argued before BISHOP, ROSALYN B. BELL and KARWACKI, JJ.

ROSALYN B. BELL, Judge.

The Board of County Commissioners of Calvert County (County) appeal a ruling of the Circuit Court for Calvert County. On November 11, 1984, the trial court held that

the application of a two-year time limit or minimum user fees to the East Prince Frederick Corporation (appellee) would violate appellee's right under the contract clause contained in the federal constitution.[1] The Board presents two issues for our consideration:

—Did the County's action in imposing a "use-it-or-lose-it" policy after entering into a contract with appellee for a water and sewer reservation violate appellee's rights under the contract clause of the federal constitution?

—Did appellee meet its burden of proof?

In July of 1978, appellee's predecessors in title reserved 4,400 gallons of sewage and water usage capacity from the County, paying $11,000. At that time, there was no restriction as to when appellee had to begin to use that capacity, and the parties understood that the 4,400–gallon allocation would be reserved until appellee, which was seeking to develop a small shopping strip, was ready to use it. At the time of the transaction, appellee had received all necessary approvals and a building permit had been issued. Construction was begun on the site, thus preserving the zoning status and the building permit, but a sewer moratorium imposed by the State health department prevented use of the sewer capacity, and construction was suspended. The

---

1. Maryland Jud.Proc.Code Ann. § 3–405 (1974, 1984 Repl.Vol.), provides in pertinent part:

"(c) **Role of Attorney General.**—If the statute, municipal or county ordinance, or franchise is alleged to be unconstitutional, the Attorney General need not be made a party but, immediately after suit has been filed, shall be served with a copy of the proceedings by certified mail. He is entitled to be heard, submit his views in writing within a time deemed reasonable by the court, or seek intervention pursuant to the Maryland Rules."

Because this was a declaratory judgment action, the Attorney General should have been notified. *Board of County Comm'rs of St. Mary's County v. Gardner*, 79 Md.App. 417, 418, 557 A.2d 260 (1989) (No. 610, Sept. Term, 1988, slip op. at 1, filed May 3, 1989). The Attorney General has not made his position known, and the record does not indicate whether there was compliance with § 3–405(c). Neither side has raised the issue.

moratorium was lifted in 1982, but appellee did not resume construction.

In 1983, the County imposed a "use it or lose it" policy. The new policy required that the allocated capacity must be used within two years. The allocation is cancelled if the holder does not use the allocation within two years; alternatively, the holder may avoid cancellation by paying minimum user fees. In accordance with that provision, appellee was billed approximately $2,000 in 1985.

Appellee denied that it was subject to these fees because of its prior contract with the County, and requested a hearing before the County Commissioners, who determined that the new policy did apply to appellee's property. Appellee filed a complaint seeking, *inter alia,* declaratory judgment and an injunction at the circuit court level. The circuit court concluded that the County's "use it or lose it" policy violated appellee's rights under the contract clause of the federal constitution.[2] Specifically, the circuit court found that the policy substantially impaired the 1978 contract between appellee and the County.

The circuit court also found that, although the limited sewer capacity in Calvert County was a good reason for limiting *new* allocations, there was no evidence indicating that it was either necessary or reasonable to limit appellee's rights under the original agreement. We disagree and explain after setting forth the relevant law.

—The Contract Clause—

The contract clause limits the power of the States to modify their own contracts, as well as to regulate those between private parties. For nearly a century after the

---

**2.** The contract clause, Art. I, § 10 of the United States Constitution provides in pertinent part:
"*No State shall* enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; *pass any* Bill of Attainder, ex post facto Law, or *Law impairing the Obligation of Contracts,* or grant any Title of Nobility." (Emphasis added.)

Constitution was adopted, it was one of the few express limitations on State power. Over the last century, however, the Fourteenth Amendment has assumed a larger place in constitutional adjudication. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 15, 97 S.Ct. 1505, 1514, 52 L.Ed.2d 92 (1977).

The prohibition against impairment of the obligation of contract is not an absolute one, however, and "is not to be read with literal exactness like a mathematical formula." *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 428, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1934). In *El Paso v. Simmons*, 379 U.S. 497, 508–09, 85 S.Ct. 577, 583–84, 13 L.Ed.2d 446, *reh'g denied*, 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 813 (1965), the Court reviewed its prior holdings to illustrate the balance between the contract clause and state interest in enacting laws to safeguard its people's interests:

> " 'It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect." Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. ... This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.' Moreover, the "economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts." The State has the "sovereign right ... to protect the ... general welfare of the people.... Once we are in this domain of the reserve power of a State we must respect the 'wide discretion on the part of the legislature in determining what is and what is not necessary.' " As Mr. Justice Johnson said in *Ogden v. Saunders*, '[i]t is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts.' " (Citations omitted.) (Ellipses in original.)

As Justice Holmes stated in *Hudson County Water v. McCarter*, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908), "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them."

In *United States Trust Co. v. New Jersey*, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977), the leading and most recent case on state impairment of contract, the Supreme Court held that New Jersey had impaired the rights of certain holders of Port authority bonds by repealing a 1962 statutory covenant which had limited the ability of the Port Authority to subsidize mass transit from its own revenues and reserves. The Court stated, at 25–26, 97 S.Ct. at 1519–1520

"The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. *As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.* A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." (Footnotes omitted.) (Emphasis added.)

It is thus apparent that a heightened standard of review is applied when the State is a party to a contract, especially where the only purpose of the legislative act is to raise money.

In *United States Trust*, 431 U.S. at 31, 97 S.Ct. at 1522, the Court stated that the extent of the contractual impairment is relevant in determining whether the State action was reasonable and necessary to serve an important public interest. In this context, the Court remarked that "a State

is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." The Court conceded in *United States Trust* that the State's interests in mass transportation and energy conservation were important and legitimate interests. The Court held, however, that the State's action in repealing the 1962 covenant, which had until repeal served to protect Port Authority bondholders' interests, was unreasonable and unnecessary to achieve the State's plan to encourage private automobile users to shift to public transportation. Simply put, the Court found that the State could find other ways to raise funds to promote mass transit. *United States Trust,* 431 U.S. at 28–32, 97 S.Ct. at 1520–1523.

In *United States Trust,* 431 U.S. at 23, 97 S.Ct. at 1518, the Court noted that, when a State impairs the obligation of its own contract, the reserved-powers doctrine comes into play:

"The initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. As early as *Fletcher v. Peck,* [10 U.S. 87 (6 Cranch) 3 L.Ed. 162 (1800)] the Court considered the argument that '*one legislature cannot abridge the powers of a succeeding legislature.*' 6 Cranch, [10 U.S.] at 135. It is often stated that 'the legislature cannot bargain away the police power of a State.' *This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment. In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty.*" (Citation omitted.) (Footnote omitted.) (Emphasis added.)

We look, then, at the contract in the instant case. Both parties agree that appellee paid consideration for a water and sewer reservation. At the time the agreement was entered into, there was no restriction on *when* appellee could begin to use the 4,400–gallon allocation. The agree-

ment was silent, however, in regard to how long the reservation could be held. But could the County create and vest irrevocable contract rights in sewer and water reservations, such that would abridge the powers of subsequent county commissioners? Put another way, should appellee's reservation be considered paramount no matter what kind of sewer and water emergency developed in Calvert County? We do not think so.

The rationale behind the County's use-it-or-lose-it policy was the very limited sewer capacity existing in the County, a valid legislative concern. *See Robert T. Foley Co. v. Washington Suburban Sanitary Commission,* 283 Md. 140, 148, 389 A.2d 350 (1978). The County would not have had the power to create sewer rights in perpetuity, which would effectively prevent the enactment of future laws to fit changed circumstances. The County did not and could not, we feel, agree to this sort of arrangement.

Apart from this, we are not convinced that there was a substantial impairment of the contractual right. The severity of the impairment is important in determining whether the State action affecting the contractual obligation has been carried out constitutionally. *State v. Good Samaritan Hospital,* 299 Md. 310, 321, 473 A.2d 892, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984). Here, there was no danger that appellee would *lose* the allocation if it either used the allocation within two years or paid a fee. The County would hold the allocation until appellee was ready to develop so long as the fee was paid. Simply adding a new obligation, by itself, does not constitute "substantial" impairment. Rather, the obligation must be one conspicuously beyond what was originally contemplated. *See Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 240, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978). In *Allied,* 438 U.S. at 247, 98 S.Ct. at 2723, the Court based its finding of substantial impairment on an obligation that imposed "a completely unexpected liability in potentially disabling amounts." In the instant case, appellee presented no evidence bearing on how the minimum user fees would

have a severe impact such as to produce a substantial impairment of its right to a reservation. Indeed, there was testimony that appellee had spent close to $90,000 on its own water pipe system, thus giving some perspective to the $2,000 minimum user fee. It thus could hardly be said to constitute a completely unexpected liability in potentially disabling amounts. Forfeiture of the allocation would, of course, have a far more serious impact, but forfeiture is entirely avoidable by paying the minimum fee.

Even if payment of a minimum user fee were considered to be a substantial impairment, the County's policy was reasonable and necessary to serve an important public purpose. At the outset, we observed that wide discretion is vested in a legislature to determine what is reasonable and necessary. As stated in *United States Trust*, 431 U.S. at 23, 97 S.Ct. at 1518, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."

The purpose of the County's use-it-or-lose-it policy was the problem of limited sewer capacity. With a waiting list of persons wanting sewer capacity that was not available, it would be eminently unsound, indeed a public burden, to have allocations which are reserved in perpetuity, yet never used by the allocation holder. It must be remembered that the County receives no money (except a minimum user fee) *until* an allocation holder begins to use the system. A pay or forfeit rule weeds out those who are holding their allocations for speculative purposes. Thus, contrary to the position espoused by appellee, the County's policy has a purpose *in addition to* raising money. The policy allows a reasonable time period for development, and then allows those who, for whatever reason, cannot yet develop to preserve their allocations by paying the fee. In short, the County policy was reasonable and necessary because it forced those just sitting on their allocations to either release that limited resource for use by someone else or take affirmative steps to preserve it for themselves.

This situation is analogous to the impairment upheld in *El Paso*, 379 U.S. at 499, 85 S.Ct. at 578, in which the State reduced the perpetual right of redemption for holders who had forfeited lands to the State to a five-year right. The Court held that the reduction was necessary to achieve orderly administration of the school lands program, just as the scheme before us is necessary for orderly administration of the sewer system. In *El Paso*, 379 U.S. at 516, 85 S.Ct. at 587–588, the Court noted:

> "Timeless reinstatement rights prevented the state from maintaining an orderly system of land sales.... The program adopted at the turn of the century ... was not wholly effectual to serve the objectives of the State's land program many decades later."

Similarly, in the instant case, when the sewer treatment system was in its infancy, perpetual reservations might not have presented a problem. But when the point was eventually reached in Calvert County where demand was so great that names were no longer being added to the waiting list, modification became eminently reasonable.

The reasonableness of the fees is supported by yet another fact. The County raises money to operate the sewer system through user charges. In order to achieve that needed level of income, it was reasonable and necessary to expect that, within a certain period, allocation holders would begin using their allocations and contributing financially to the system. If appellee did not use its allocation within this normal course of time, it was reasonable and necessary to require that appellee begin paying the minimum amount that that allocation would have been expected to generate when the capacity was originally set aside.

Appellee argues that this situation was analogous to that presented in *Farmer v. Jamieson*, 31 Md.App. 37, 354 A.2d 225 (1976). We disagree. In that case, we held it to be an improper impairment for the local government to attempt to remove from master sewer lists a property that had been previously approved for sewer allocation. The Court said that the agreement had become "a binding and enforceable

contract, *at least after the developers spent substantial sums in reliance thereon."* *Farmer,* 31 Md.App. at 44, 354 A.2d 225 (emphasis added). Appellee argues that it, too, has expended substantial sums in reliance, and therefore its allocation cannot be cancelled. Putting aside for the moment the fact that fee collection, not cancellation, is the issue here, the fact is that the expenditure of funds by appellee "in reliance" came *after* the passage of the resolution complained of,[3] and after it was clear, because of user-fee billings, that the County considered appellee to be covered by its terms. Thus, any reliance on the part of appellee was without justification. The reliance needed to form estoppel does not occur where the person claiming benefit of the defense has actual notice of the facts, making reliance unreasonable. The party must be misled and change his or her position for the worse, believing and relying on the representations of the party sought to be estopped. *See Savonis v. Burke,* 241 Md. 316, 317–21, 216 A.2d 521 (1966).

In sum, the obligation imposed on appellee was not a substantial impairment. Even assuming that it was, the legislative scheme under which it was imposed was reasonable and necessary to achieve an important public purpose. Because we find no violation of the contract clause, we do not need to reach the second issue presented by the County.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEE.

---

**3.** Appellee spent approximately $90,000 to extend water and sewer lines sometime in 1986 or 1987.