896 A.2d 439

**Roger TWIGG et al.**

v.

**RIVERSIDE APARTMENTS, LLC, et al.**

**No. 1047, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

April 12, 2006.

---

Kurt J. Fischer (Marta D. Harting, DLA Piper Rudnick Gray Cary US LLP, on the brief), Baltimore. (Saundra Nickols, City Atty., Justin Hayes, Asst. City Atty., on the brief), Frederick, for appellant.

Philip Andrews (Jeffrey H. Scherr, Thomas M. Nanni, Kramon & Graham, PA, on the brief), Baltimore, for appellee.

Panel: DAVIS, JAMES R. EYLER and RAYMOND G. THIEME, JR., (retired, specially assigned), JJ.

DAVIS, J.

The Circuit Court for Frederick County, on June 23, 2005, granted summary judgment in favor of Riverside Apartments, LLC (Riverside), *et al.*,[1] appellees, and entered judgment against the City of Frederick (the City), a municipal corporation, and Roger Twigg, Division Manager for the City's Building Department (collectively, the City). The City appeals from the court's Opinion and Order, seeking review of the following three issues:

1. Are the Special [One Dollar per Square Foot] Fee and the City's purported waiver of all other municipal fees and assessments void under Maryland municipal law because the imposition of the fee and waiver of all other fees were accomplished by a private agreement of the Mayor and not by an ordinance as required by Article 23A, § 2(b) of the Annotated Code of Maryland?

2. Is the purported waiver of all other municipal fees and assessments agreed to by the Mayor void because it conflicts with the annexation resolution pursuant to which [Riverside's] property was annexed?

3. Did the Deferral Agreement which [Riverside] seeks to enforce expire on June 11, 2005 with no continuing rights or duties thereunder?

Because we answer the first question in the affirmative, we will not address the second and third questions. Accordingly, we shall reverse the judgment and remand to the circuit court.

---

1. River Walk Apartments, LLC and Monocacy River Apartments, LLC are successors-in-title to Riverside Apartments, LLC and moved before this Court to be substituted as appellees in this matter. We shall, nevertheless, continue to refer to Riverside as the appellee, recognizing that our decision in this opinion regarding Riverside applies to River Walk Apartments and Monocacy River Apartments as successors-in-title to Riverside.

### FACTUAL BACKGROUND

Riverside South, LLC (Riverside South), as predecessor-in-title to Riverside, owned what was referred to as the South Campus of the Riverside Corporate Park Project, approximately 122 acres of real property at issue in this case (the Property), located within the City. On November 6, 2000, Riverside South, in conjunction with other Riverside corporate entities [2] listed collectively as "the Property Owner," contracted with the City to delineate and set forth development plans for the Property, "located on the north and south side of Gas House Pike, east of Monocacy Boulevard," and "such Property intended to be developed as the Riverside Corporate Park."

The City indicated in the November 6, 2000 Agreement, (November Agreement), that it intended

> . . . to commence and complete a project known as Phase III Extension of Monocacy Boulevard, which will complete Monocacy Boulevard from its existing intersection with Gas House Pike to the existing terminus at Hughes Ford Road, and also an upgrade of Gas House Pike from its intersection with Monocacy Boulevard to the eastern corporate limits of the City, and in conjunction therewith to install utilities and other improvements in certain sections of the project, which improvements may include water, sewer, storm drain, telephone, electric, conduit for fiber optics, natural gas, curbs, gutters, sidewalks, and streetlights, and also to make certain improvements to existing intersections along Gas House Pike and Monocacy Boulevard. . . .

The Property Owner was to "dedicate to the City for no charge, any and all additional rights-of-way needed for the upgrade and widening of Gas House Pike along the frontage of the Property. . . ." In addition, the City agreed that

> . . . in consideration of the Property Owner or its successor(s) or assigns paying [a] One Dollar ($1.00) per square

---

**2.** The other Riverside companies included the Riverside Investment Group LLC; Riverside Industrial Properties LLC; Riverside Technology Park I, LLC; Riverside Technology Park II, LLC; and Riverside Technology Park III, LLC.

foot fee ... [the Property Owner] shall not be subject to and the City shall not collect any additional impact fee as a condition of development of and/or construction of improvements on the Property, and further the Property shall not be subject to restrictions imposed by ... any Adequate Public Facilities Ordinance or similar law or ordinance which may have the effect of restricting or delaying development of the Property, which such law or ordinance may be passed by the City subsequent to the execution of this Agreement.

The Property Owner was also responsible for drafting documents to establish the Property as a Tax Increment Financing District (TIF) and for paying the "deferred contribution special assessment to the cost of the Project." The November Agreement mandated that the deferred contribution was to be, as noted above, "One Dollar ($1.00) per square foot of gross floor area of any proposed building to be constructed on the Property." The contribution was to be paid upon the Property Owner's application to the City for the Shell Construction Permit for the proposed building, *"and no additional fee for the special assessment shall be assessed or contribution required in conjunction with future permits for the same building, unless the square footage of the gross floor area of the building increases."* The contribution was to be binding "upon all purchasers of the Property and/or successors to [or assigns of] the Property Owner." All members of the Property Owner and the Mayor of the City at that time, James Grimes, signed and executed the November Agreement.

On June 11, 2004, the City, represented by the then-Mayor, Jennifer Dougherty, and the corporate entities referred to as the Riverside Owners,[3] entered into an Agreement to Defer Public Improvements (Deferral Agreement) on the Property. The parties reiterated their arrangement concerning the contribution fee from the November Agreement, stating that "the

---

3. The Riverside Owners were Riverside South, predecessor-in-title to Riverside, Riverside Industrial Properties LLC, and Riverside Investment Group LLC.

Riverside Owners affirm the obligation of the Lot Purchasers [4] and/or owners/developers of the Site Plan Lots [of the Property] to pay [the City] a fee in the amount equal to $1.00 per ... square foot of improvements to be constructed on the Site Plan Lots, to be paid at time of building permit issuance." In addition, the City further agreed

> .... that in consideration of payment of [the Fee], the Lot Purchasers and/or owners/developers of the Site Plan Lots shall not be required to pay any additional assessment whatsoever for off-site improvements. In no event shall any of the Lot Purchasers and/or owners/developers of the Site Plan Lots be required to pay any fees or assessments or otherwise be held responsible for payment of any fees or assessments related to offsite improvements beyond the $1.00 per square foot to be paid at time of building permit issuance.

The Deferral Agreement was to "be binding upon the Parties" and "their respective heirs, successors and assigns...." The Deferral Agreement also stated it was to be "a covenant that shall run with the lands [as designated] and shall inure to the benefit of the Parties and the respective Lot Purchasers and their respective successors and assigns."

During the time between the parties' November and Deferral Agreements, the Mayor and Board of Aldermen for the City enacted impact fee ordinances for the City's water and sewer systems and park facilities in October 2002 to address property development and improvement concerns. The City's stated purpose for the water and sewer impact fees was to

> ... requir[e] that new residential, commercial, institutional and industrial development pay for its appropriate share of capital improvements to the city's water and sewer treatment and distribution systems through the imposition of

---

4. As the Deferral Agreement noted, "[t]he Riverside Owners subsequently entered into contracts of sale for the sale of the Site Plan Lots, and in some cases have closed on the sale of Site Plan Lots to unaffiliated third parties; such third party purchasers of the Site Plan Lots are collectively ... referred to as the 'Lot Purchasers.' "

water and sewer impact fees which will be used to finance, defray and reimburse the city for all or a portion of the costs of capital improvements to the city's water and sewer treatment and distribution systems.

Similarly, the City passed an ordinance for the park facilities development impact fee to

... requir[e] that new residential development pay for its appropriate share of park development and improvement through the imposition of a park facilities development impact fee which will be used to finance, defray or reimburse the city for all or a portion of the costs of park development and improvement which serve such residential development.

In October of 2004 and March of 2005, River Walk Apartments, then a member of Riverside, applied to the City's Building Department, with its one dollar per square foot fees, for permits for construction of a total of forty-eight shell buildings and units. The Department denied the permits, advising that the permits would not be issued until the City also received payment for water and sewer fees, park fees, and all other impact fees.

On April 4, 2005, Riverside filed a Verified Complaint against the City, seeking a writ of mandamus and specific performance. Riverside requested the court to order Twigg to issue the applicable permits pursuant to the "unambiguous written agreements." Riverside also alleged that the City was in breach of contract, noting that it had "timely tendered to Twigg the agreed-upon One Dollar Per Square Foot Fee provided for in the November Agreement," while the City, instead, rejected its "tender of the agreed-upon Fee," refused to issue the permits and demanded payment of additional fees "in excess of the One Dollar Per Square Foot Fee". Riverside prayed that the November Agreement be specifically enforced and that the City issue the permits with Riverside remitting no additional payments for inapplicable fees. Riverside also filed a Motion for Summary Judgment, pursuant to Maryland

Rule 2–501 simultaneously, requesting that the court enter judgment in its favor as a matter of law.

The City responded that the fee provisions presented genuine disputes as to material facts because the fees were taxes that the City could not impose, in the case of the one dollar fee, or waive, in the case of the impact fees without General Assembly authorization. The City maintained that, because it engaged in *ultra vires* acts, it should not be held to perform under the Agreements.

The court conducted a Motions Hearing on June 15, 2005. After taking the matter under advisement, the court issued its Opinion and Order dated June 23, 2005:

> The original contract entered into between [the City and Riverside's] predecessors-in-interest in November of 2000 provided:
>
>> It is the intention of the parties to this Agreement that the One Dollar ($1.00) per square foot special assessment contribution by the Property Owner, or their successor(s) and/or assigns, and the dedication along Gas House Pike . . . shall fully satisfy and complete the Property Owner's and/or the Property's proportionate and equitable share of any past, present or future off-site public improvements or facilities of any kind or nature whatsoever, based on a rational nexus between the impacts on public improvements or facilities resulting from the development of the Property and the need and cost of those public improvements and facilities.
>
> The next contract entered into between [the City and Riverside's] predecessors-in-interest was the Deferral agreement, which was signed in June of 2004. The Deferral Agreement provided, in pertinent part:
>
>> In no event shall any of the Lot Purchasers and/or owners/developers of the Site Plan Lots, as the case may be, be required to contribute towards, be assessed for, or otherwise be held responsible for payment of any potential increase to the Fee beyond the $1.00 per square foot to be paid at the time of building permit issuance.

These agreements are clear and unambiguous. In each agreement, the City, in exchange for the rights-of-way granted to it by Riverside, pledges to charge [Riverside] no more than the $1.00 per square foot special assessment for building permits. The City, however, has refused to issue any permits despite the fact that Riverside has complied with the terms of the contracts and paid the required special assessment fee for each permit it has applied for. The City, instead, attempts to charge Riverside for additional environmental impact fees beyond the agreed upon assessment.

This position is not consistent with the agreements entered into by the City in November of 2000 and June of 2004. While the City has willingly accepted the benefits of their agreements—the rights-of-way granted to it by Riverside—it has not fulfilled its obligations under the same contracts. The City entered into a valid and enforceable contract with [Riverside] and must, like any other individual or entity, live up to the terms of its agreements. Accordingly, because there are no material facts in dispute, it is appropriate to enter summary judgment on behalf of [Riverside].

For the reasons set forth herein, it is this 23rd day of June, 2005, by the Circuit Court for Frederick County, Maryland hereby

**ORDERED** that [Riverside's] Motion for Summary Judgment shall be **GRANTED.** It is further **ORDERED** that [the City] shall not require [Riverside] to pay any additional fees, beyond the one dollar per square foot agreed upon, to acquire the building permits contemplated in the contract alluded to herein. (Citations to complaint exhibits excluded.)

The City then filed a timely appeal to this Court.

### LEGAL ANALYSIS

The City contends that the circuit court erred as a matter of law when it enforced the special one dollar fee agreed to by

Riverside's predecessors-in-title and previous City administrators because the fee and waiver of other applicable fees are void under municipal law. The City insists that the special fee, as noted in the agreements, cannot be upheld because the imposition of such a fee requires the municipality to enact an ordinance to collect the fee. In addition, the City posits that the waiver or exemption of impact fees is not permitted unless the City had express authorization to do so. The City also assigns error to the court's enforcement of the waiver of applicable fees which, the City claims, conflicts with the Annexation Resolution under which the subject property was annexed, and for upholding the special fee arrangement under the parties' Deferral Agreement after the agreement expired.

## I

Pursuant to Maryland Rule 2–501(f), a trial court

> shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

*Md. Rule* 2–501(f)(2006). "Appellate courts reviewing an order granting a motion for summary judgment must determine whether the trial court was legally correct." *Maryland Cas. Co., et al. v. Lorkovic,* 100 Md.App. 333, 354, 641 A.2d 924 (1994)(quoting *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005 (1993)). Because we review a trial court's grant of summary judgment *de novo,* we must first decide whether a genuine dispute of material fact exists. *de la Puente, et al. v. County Comm'rs of Frederick County,* 386 Md. 505, 510, 873 A.2d 366 (2005). If a genuine dispute as to a material fact does not exist, "we proceed to review determinations of law," and examine the "facts properly brought before the court, and any reasonable inferences that may be drawn from them [ ] construed in the light most favorable to the nonmoving party." *Id.* (citations omitted).

Generally, with respect to contract construction, we have previously reiterated:

The construction of a written contract is a question of law, subject to *de novo* review by an appellate court. As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. Moreover, the primary source for determining the intention of the parties is the language of the contract itself.

Contracts are interpreted as a whole to determine the parties' intentions. Ordinarily, the terms of a contract are construed consistent with their usual meaning, unless it is apparent that the parties ascribed a special or technical meaning to them.

In ascertaining the parties' intent, Maryland follows the objective law of contract interpretation. Thus, the court is required to give effect to [the contract's] plain meaning, without regard to what the parties to the contract thought it meant or intended it to mean. Generally, it must be presumed that the parties meant what they expressed. Therefore, the true test of what is meant is ... what a reasonable person in the position of the parties would have thought the contract meant. If only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent. In addition, the parties to an agreement are deemed to have contracted with knowledge of existing law. . . .

When a contract is clear and unambiguous, its construction is for the court to determine. Whether a contract is ambiguous is a question of law, which is subject to *de novo* review by an appellate court. Contractual language is considered ambiguous when the words in it are susceptible of more than one meaning to a reasonably prudent person. A contract is not ambiguous, however, merely because the parties to it do not agree as to its meaning.

To determine if contractual language is susceptible of more than one meaning, a court reviews the contract itself. It must also consider the character of the contract, its purpose, and the facts and circumstances of the parties at

the time of the execution. But, it is not the province of the court to rewrite an agreement to rectify an ambiguity, to avoid hardship to a party, or because one party has become dissatisfied with its terms.

*Young v. Anne Arundel County,* 146 Md.App. 526, 585–87, 807 A.2d 651, *cert. denied,* 372 Md. 432, 813 A.2d 259 (2002) (citations and quotation marks omitted). See also *Heist v. Eastern Sav. Bank, FSB,* 165 Md.App. 144, 150, 884 A.2d 1224 (2005).

Notably, as the Court of Appeals explained, a municipal corporation

possesses only limited powers. In *McRobie v. Town of Westernport,* 260 Md. 464, 466, 272 A.2d 655, 656 (1971), we quoted with approval from 1 J. Dillon, Municipal Corporations s 237 at 449 (5th ed.1911), as follows:

"a municipal corporation ... can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation,-not simply convenient, but indispensable." (Emphasis in the original.)

*Birge v. Town of Easton,* 274 Md. 635, 639–40, 337 A.2d 435 (1975). *See also City of New Carrollton v. Belsinger Signs, Inc.,* 266 Md. 229, 237, 292 A.2d 648 (1972).

Referring specifically to contracts involving governmental entities, the Court of Appeals has held:

... [C]ounties and municipalities are normally bound by their contracts to the same extent as private entities. Thus, Maryland law has never recognized the defense of governmental immunity in contract actions against counties and municipalities. This Court has repeatedly held that, as long as the execution of the contract [is] within the power of the governmental unit, the local government is answerable in damages for breaching that contract. Under some circumstances, courts have ordered that local governments specifically perform thei contracts.

*Montgomery County v. Revere Nat'l Corp. Inc.,* 341 Md. 366, 384–85, 671 A.2d 1 (1996) (citations and quotation marks omitted).

## II

### a. Special One Dollar Fee and Article 23A

■ The City argues that the court should have voided the one dollar per square foot fee to which the parties agreed and which was set forth in the November and Deferral Agreements because the City, more specifically, the Board of Aldermen, failed to enact an ordinance, as required by statute, to allow for the imposition of that fee. Moreover, because the City had not enacted an ordinance that permitted it to waive the impact fees as codified in the Frederick City Code, the City contends that previous mayoral administrations engaging in *ultra vires* acts of imposing the special fee and waiving the impact fees as contained within the Agreements was also not permitted and Riverside must pay these fees in addition to the special fee. In light of Maryland Code, Article 23A, § 2 and the City's Charter, we are persuaded by the City's arguments.

The municipal corporation statute, codified at Article 23A, § 2, states, in part:

(a) *The legislative body of every incorporated municipality in this State,* except Baltimore City, by whatever name known, *shall have general power to pass such ordinances* not contrary to the Constitution of Maryland, public general law, or, except as provided in § 2B of this article, public local law as they may deem necessary in order to assure the good government of the municipality, to protect and preserve the municipality's rights, property, and privileges, to preserve peace and good order, to secure persons and property from danger and destruction, and to protect the health, comfort and convenience of the citizens of the municipality ...

(b) ... *such legislative body shall have the following express ordinance-making powers:*

... (33) Subject to the limitations imposed under Article 24 of the Code, the Tax—General Article, and the Tax—Property Article, to establish and collect reasonable fees and charges:

(i) For the franchises, licenses, or permits authorized by law to be granted by a municipal corporation; or

(ii) Associated with the exercise of any governmental or proprietary function authorized by law to be exercised by a municipal corporation.

Md.Code (2005 Repl.Vol.), art. 23A, §§ 2(a)-(b)(emphasis added).

The Charter of the City provides in Article II, Section 7, that "All legislative powers of the city shall be vested in a board of aldermen consisting of five (5) aldermen who are elected...." These aldermen

shall have the power to pass all ordinances not contrary to the Constitution and laws of Maryland or this Charter, as it may deem necessary for the good government of the city; for the protection and preservation of the city's property, rights and privileges; for the preservation of peace and good order and for securing persons and property from violence, danger or destruction; and for the health, comfort, and convenience of the residents of Frederick....

The Board of Aldermen are responsible, according to the Charter, for "All ordinances [being] in writing and may be passed by the board of aldermen at the meeting in which they are introduced. All ordinances shall be signed by the mayor as president of the board of aldermen and approved by him as mayor." The Board in conjunction with the Mayor of the City "shall codify all of the ordinances of the city in permanent form."

Patently, Article 23A and the City's Charter make clear that the City, as a municipal corporation, has limited powers. The one dollar per square foot fee at issue here is not a product of a statute or legislative enactment, but represents an agreed-upon figure memorialized in the November and Deferral Agreements between the City's mayors and Riverside's prede-

cessors-in-title. In the November Agreement, the parties agreed that the Riverside developers would make the deferred contribution of the one dollar fee and, as part of the Agreement, "dedicate to the City for no charge any and all additional rights-of-way needed for the widening and upgrade of Gas House Pike along the frontage of the Property. . . ." The Riverside developers then affirmed the Lot Purchasers' one dollar fee "obligation" four years later in the Deferral Agreement, which also stated that the Lot Purchasers "shall not be required to pay any additional assessment whatsoever for off-site improvements." The City's levy of this fee upon Riverside's predecessors-in-title, however, constituted an act in contravention to the municipal corporation statute and the legislative body of the City.

This special fee was not contemplated by appellants to be an enactment that would be subsequently applied to every developer conducting business within and with the City. The powers of the City's Board of Aldermen, according to Article 23A and the City's Charter, much like a corporation's Articles of Incorporation, Bylaws and Charter, nevertheless, mandate that any reasonable fee imposed by the City, in general, must have been a legislative act by the City's Board of Aldermen, and approved by the Mayor. Because this fee was not a legislative enactment, we hold that the court erred in upholding this fee.

We reject Riverside's contentions that the fee was merely a contractual term and that case law constrains us to affirm the court's judgment and order the City to perform under these Agreements.[5] *Cohen v. Baltimore County*, 229 Md. 519, 520,

---

**5.** Riverside referred to the case of *Bd. of County Comm'rs of Harford County v. MacPhail*, 214 Md. 192, 194, 133 A.2d 96 (1957), where the Court of Appeals considered an informal agreement between the County Commissioners of Harford County and a farm owner. There, Mac-Phail sought to compel the County Commissioners to specifically perform an action to which it agreed; "to grade, base, align and pave" the last eight-tenths of a mile stretch of road that ran through MacPhail's farm. The trial court found in favor of MacPhail, ruling that the Board's minutes in which it stated it would improve the stretch of road in order that it would be consistent with the paved portion bound Harford County to improve the road. *Id.* at 199, 133 A.2d 96.

185 A.2d 185 (1962), relied upon by Riverside, is factually similar to the case at bar, but is distinguishable as to one critical fact. There, the Court reviewed a contract between the county executive of Baltimore County and owners of commercial property, Lee Cohen and his partners of Court Plaza Realty Company, in which Baltimore County, agreed to construct a road that would run through the shopping center area to be built on the property. The Court noted that, at trial

> the County admit[ted] that it negotiated with Court Plaza to acquire a right of way for the construction by the County of a new road through the property mentioned and adjacent property. And although it was denied in the answer, the chancellor found that as a result of the negotiations an oral agreement was made whereby Court Plaza would convey the required right of way to the County without compensation for such severance damages as would ensue as a result of the taking. . . .

*Id.* (footnote omitted).

When Cohen filed for specific performance of the contract after the successor county executive "refused to allot county funds for the road . . .," the chancellor denied Cohen's requested relief finding that "The agreement was not executed with such formality as is required to bind the County. . . ." *Id.* at 522, 185 A.2d 185. Stated another way, Baltimore County contended on appeal that Court Plaza could not prove "an agreement [existed] that was clear, unambiguous and certain and one that was fair and mutual," and thus was not entitled to relief. *Id.* at 523, 185 A.2d 185. In reversing the chancel-

---

The Court of Appeals agreed with the trial court, concluding that the chancellor's findings considering the facts of the case were "fully justified." *Id.* The Court explained that "the evidence warranted the action the chancellor took since the agreement he required to be executed was sufficiently definite and certain properly to be the subject of what, in effect, was specific performance, . . . ." *Id.* at 199–200 [133 A.2d 96]. In affirming the trial court, the Court stated the chancellor's decree "merely directed the County Commissioners to construct the MacPhail Road, as they had agreed to do, in accordance with [the County's] uniform and well defined practice." *Id.* at 200, 133 A.2d 96.

lor's decree because of the clear terms of the contract, the Court opined:

> We find nothing in the record to indicate any ambiguity or lack of clarity and certainty in the agreement between the parties, the terms of which, as set forth in the officially approved proposal, were accepted by the owners of the shopping center. And the same is true with respect to the conveyance by Court Plaza of the right of way to the County in furtherance of and in reliance on the final agreement. Nor do we find anything to indicate that the agreement was unfair or lacked mutuality: indeed the record discloses that Court Plaza had fully performed the agreement before it sought specific performance. As we read the record, the parties made a readily understandable agreement to the effect that Court Plaza would grant the County a right of way in fee for a public road through its property if the County in consideration of the grant would pave the right of way and construct curbs and gutters thereon. And in the deed, it was further covenanted that Court Plaza would not be subject to any special assessment by reason of the construction of the road.
>
> *So, as we see it, unless there are charter or statutory provisions to the contrary, the county executive not only had power to make the agreement in controversy, but authority to give it legal effect by approving it in the form in which it had been prepared to evidence the intentions of the contracting parties.*

*Id.* at 523–24, 185 A.2d 185 (emphasis added). The Court instructed that, "[s]ince the usual test of determining the validity of municipal action is reasonableness, the general rule is that when the mode of making a contract is not limited or prescribed by charter or statute, the adoption of a method to give effect to powers expressly granted is left to the discretion of the municipality...." *Id.* at 525, 185 A.2d 185. The Court also referred to its decision in *MacPhail, supra,* though not on point, as "authority for the proposition that an informal agreement made by a county in the exercise of discretion of its commissioners is binding on the county and is enforceable."

*Id.* The Court then remanded the matter for the court to enter a decree granting Cohen's request for specific performance. *Id.*

Despite the clarity and unambiguity of the language contained within the Agreements, the *Cohen* Court noted that, if there were statutes or provisions in the Baltimore County charter that specifically stated that the county executive could not enter into the subject contract, he would have been prohibited from doing so. In the case at bar, Article 23A, together with the Charter, empowers the legislature, the City's Board of Aldermen, as the only governmental entity that can enact ordinances related to the imposition of fees upon residents and businesses within the City. We are here presented with code provisions of a municipality's charter and state statutes that require enactment of an ordinance in order to levy a fee in direct contravention to the Agreements as entered into and signed by two municipal administrations.[6]

---

6. Riverside also mentions the case of *Montgomery County v. Revere Nat'l Corp. Inc.*, 341 Md. 366, 671 A.2d 1 (1996), where the Court reiterated its holding in *MacPhail*. Revere, a billboard company, filed a complaint to enforce a settlement agreement between it and Montgomery County to allow Revere to keep and maintain its then-existing billboards for ten years, despite a County zoning regulation that prohibited all billboards. *Id.* at 369, 671 A.2d 1. In rejecting the County's claims that its private settlement agreement interfered with and, in effect, "relinquish[ed] the County Executive's legal obligation to enforce the ... laws and ordinances of the County," the Court concluded that,

... under certain circumstances and in some contexts, an attempt by a government to limit future executive discretion by contract would be invalid. For example, a contract by a Governor purporting to limit the Governor's constitutional authority and discretion in the future appointment of judges would clearly be unenforceable.

Nevertheless, as a general matter, executive discretion in the enforcement and execution of the laws can be limited by contract. In fact many, if not most, government contracts limit to some extent executive discretion in carrying out the laws and functions of government. If future executive discretion could not lawfully be limited by contract, a great many government contracts would be unenforceable.... [H]owever, governments are generally bound by their contracts.

*Id.* at 388, 671 A.2d 1 (citations omitted).

In light of *MacPhail*, the Court concluded that, "when the executive branch of the county government, in carrying out the laws and func-

As such, it is evident that the mayors, as city executives, acted *ultra vires* and exceeded their authority by entering into the subject Agreements with the special one dollar fee.

The decision of the Court of Appeals in *Inlet Assocs. v. Assateague House Condo. Ass'n*, 313 Md. 413, 545 A.2d 1296 (1988), we conclude, is controlling. Appellants argue that, like Ocean City in *Inlet*, the City should not be estopped from claiming that the one dollar fee is void and this Court, according to the City, should accordingly invalidate the one dollar fee. The property development scheme at issue in *Inlet* included the following:

Inlet planned to construct a hotel and marina complex on the Holt's Landing property. In furtherance of its plans, Inlet's managing partner, Leo D'Aleo, appeared before a public work session of the City Council of Ocean City on August 28, 1985. At that time, D'Aleo proposed alternate plans for the development of the property, one of which contemplated utilizing, as part of the hotel building site, 25 feet of the southerly side of South Division Street, the length of which extended some 275 feet from Philadelphia Avenue to the bay. By obtaining this additional land, Inlet would be able to construct a larger hotel complex than if it was required to build it entirely on Holt's Landing property. In addition, Inlet's plan contemplated using the City's riparian rights in the western terminus of South Division Street to enable it to construct pavilion shops on a pier to be erected into the bay. Under this plan, and in exchange for these rights from the City, Inlet would provide a number of

---

tions of government, enters into a contract, such action constitutes the exercise of executive discretion. A requirement that the government adhere to that exercise of discretion, and be held to its contract, ordinarily does not constitute an unlawful interference with future executive discretion." *Id.* at 390, 671 A.2d 1. As we noted in discussing *Cohen*, however, this case is distinguishable in that there are statutes in place here that mandate which governmental entity has the ability to impose reasonable fees, like the subject special one dollar fee. Because the board of aldermen is the only body entrusted with that power, the mayors acted beyond their authority.

public amenities to enhance the revitalization of the project area, including a bay-front public boardwalk.

*Id.* at 418, 545 A.2d 1296.

Inlet purchased the million-dollar Holt's Landing property after the City Council voted in favor of its proposal. *Id.* at 420, 545 A.2d 1296. Proceeding upon the advice of the City Solicitor, who advised that the City Charter allowed for the planned conveyance by way of resolution, the development plans continued, but were interrupted when the Mayor of Ocean City refused to sign the agreement documents based on his belief that the conveyances could only be executed by an ordinance. *Id.* at 421–22, 545 A.2d 1296. Subsequently, property owners and individual taxpayers in the surrounding area filed a complaint to enjoin Ocean City from transferring the right-of-way and riparian rights and to have the court declare that Ocean City acted *ultra vires* in regard to proceeding with the development by way of a resolution as opposed to enacting an ordinance. *Id.* at 422, 545 A.2d 1296. The trial court found for the property owners and declared Ocean City's acts *ultra vires.*

The Court of Appeals granted *certiorari* and affirmed the trial court, finding that Ocean City's violation of conveying property and rights-of-way that benefitted the public, to a private entity by simple resolution was *ultra vires* and void in light of the city's charter requiring that such conveyances be made pursuant to an ordinance. *Id.* at 432–33, 545 A.2d 1296 The Court also held that Ocean City was not estopped from refusing to convey a public right-of-way and riparian rights, notwithstanding that the City acted "in clear violation of a fundamental charter requirement that it act by ordinance" when it granted Inlet a public right of way.[7] *Id.* at 438, 545

---

7. Regarding the *Inlet* parties' agreement, the Court explained:

The purported agreement between Inlet and Ocean City encompassed more than merely a street closing and assignment of municipal riparian rights. These proposed conveyances were inextricably tied to, and provided the quid pro quo for, Inlet's willingness to provide and maintain the heretofore described public amenities by which,

A.2d 1296. The Court reasoned that despite the City Council's history of routinely enacting resolutions to close partial streets or alleys,

[c]onsidering the central involvement of South Division Street and the waters of the bay in Inlet's proposal, and the magnitude of the property interests involved (City property of estimated value approximating one million dollars), a simple resolution, neither reduced to writing nor journalized as required by the City Charter, cannot suffice to validate the City's actions. An ordinance was thus fundamental to the legality of the conveyances here in question; without it, the City Council's action was without legal effect.

*Id.* at 433–34, 545 A.2d 1296.

Although the fact pattern is reversed in the case *sub judice* from the facts of *Inlet, i.e.,* Ocean City conveyed its public right-of-way to a private developer and the City here gained a right-of-way from Riverside in exchange for fees, in both cases the issue is the proper exercise of authority by the legislative and executive bodies within the municipality. Ocean City's City Council was statutorily bound to enact an ordinance to execute the proposed transfer; here, the City's Board of Aldermen, as the legislative branch, was required to duly enact an ordinance to collect the special fee. In addition, the *Inlet* Court noted that the Mayor of Ocean City disapproved

---

along with its own construction projects, it proposed to revitalize the bay side of downtown Ocean City. Inlet's proposal was properly characterized as a general plan of development, a comprehensive effort toward the redevelopment of downtown Ocean City. If implemented, therefore, the project would make very substantial changes in the face of downtown Ocean City. Plainly, it involved more on the part of the Council than the mere ministerial or administrative execution of an existing law. Legislative action by the Council was required consistent with the requirements of Article 23A, § 2(b)(24) and § C–414(49) of the City Charter to sanction the "swap" of City property for the public amenities to be provided and maintained by Inlet. The City and Inlet were trading benefits as a means of triggering a new plan of development which was of great importance to the people and future of Ocean City-a plan in which the City's dedicated street and riparian rights were key instruments, and without which the planned project might not proceed.

*Id.* at 431–32, 545 A.2d 1296.

of Inlet's development plans without a City ordinance at the outset of the plan. Here, the mayors seemingly failed to consider whether they possessed the authority to enter into these Agreements; the result was that their acts were *ultra vires*.

### b. The City's Waiver of Impact Fees

■ The City insists that its authorization to enact reasonable impact fees under Article 23A, § 2(b)(33) does not include any authority on its part to exempt such fees. If the previous administrations meant to have these fees waived as to Riverside, the City asserts that a separate ordinance should have been passed to allow for Riverside to waive the impact fees. Patently, the City possesses the authority to impose impact fees under Article XI–E [8] and enact ordinances as set forth in Article 23A § 2(b)(33). The City acted well within its authority when it enacted the water and sewer and park facilities development impact fees. The fact that these fees were not waived or excepted by City ordinance, despite the City's Agreements with Riverside, leads us to conclude that the waivers set forth within the Agreements are also void.

Again, the central issue concerns the actions of the mayors and the lack of any involvement by the Board of Aldermen regarding the Agreements with Riverside. As stated previously, the mayors entered into fee arrangements that could only have been executed by ordinance. In fact, the Board, having no involvement in the Agreements, but in response to growing land development concerns within the City, enacted the water, sewer and park facilities impact fees as ordinances to collect such fees. Codified at Chapter Eleven of the City's Charter, the Board's authorization for both ordinances reads:

---

**8.** The Maryland Constitution, Article XI–E, provides, in pertinent part, that a municipal corporation shall not "levy any type of tax, license fee, franchise tax or fee which was not in effect in such municipal corporation on January 1, 1954, unless it shall receive the express authorization of the General Assembly for such purpose...." Md.Code (2003 Repl. Vol., 2005 Supp.), Const. Art. XI–E, § 5.

Article XI–E of the Maryland Constitution, Article 23A of the Annotated Code of Maryland, and the City of Frederick Charter authorize the city to enact ordinances for the protection and promotion of public safety, health, welfare, comfort, convenience and happiness.

Each ordinance also lists separate exemptions, as part of the impact fees, that developers would have to claim before development began, or risk the exemption being waived. Under the water and sewer impact fees, the following types of development are exempted:

New development where no additional water or sewer use is created;

Alterations or expansions of an existing building, where no additional water or sewer use is created;

The replacement of a destroyed or partially destroyed building structure, with a new building or structure of the same size and use, where no additional water and sewer use is created;

Installation of fire sprinkler system;

The off-site replacement of a demolished structure with a new building or structure where no additional water or sewer demand is created, provided the demolition and replacement are performed pursuant to a comprehensive replacement plan, including reconstruction on-site within a defined period of time, which is approved by the director of planning and community development prior to the demolition of the structure.[9]

---

9. To be exempt from the park facilities development impact fee, the new developments must consist of:

Alterations or expansions of an existing residential building, where no additional dwelling units are created and where the use is not changed.

The construction of accessory buildings or structures.

The on-site replacement of a destroyed or partially destroyed structure with a new building or structure where no additional dwelling units are created.

The off-site replacement of a demolished structure with a new building or structure where no additional dwelling units are created, provided the demolition and replacement are performed pursuant to

The City also cites to our opinion in the case of *Bd. of County Comm'rs of Calvert County v. E. Prince Frederick Corp.*, 80 Md.App. 78, 559 A.2d 822 (1989), *aff'd*, 320 Md. 178, 577 A.2d 27 (1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991), for the proposition that where governments are deemed to have bargained away their sovereignty through an agreement with a private entity, that agreement becomes voidable.

In *E. Prince Frederick*, the Calvert County government agreed to allot thousands of gallons of sewage and water usage to the predecessors-in-title to appellee corporation without restriction as to when appellee had to start using its capacity. *Id.* at 80, 559 A.2d 822. Five years after the agreement, however, Calvert County adopted a policy that required any allocated sewage and water capacity must be used within two years of the allocation or the holder risks having the allocation cancelled or being charged user fees. *Id.* at 81, 559 A.2d 822. The trial court ruled that Calvert County's new policy violated appellee's rights under the Contract Clause of the federal constitution as applied to appellee's initial unrestricted allotment. *Id.* We reversed, however, holding that the County's new policy did not violate the contract clause because the policy did not amount to substantial impairment of contract and, the County's policy modification was reasonable and necessary to achieve an important public purpose of monitoring the limited sewer capacity within Calvert County. *Id.* at 85–86, 559 A.2d 822.

Although our decision in *E. Prince Frederick* dealt with government contracts under federal constitutional principles, while here, Riverside prayed for relief pursuant to the remedy of specific performance of the Agreements, the decision highlights the delicate balance of rights a government possesses.

---

a comprehensive replacement plan which is approved by the director of planning and community development prior to the demolition of the structure.

The installation of a replacement mobile or modular home on a lot or other such site when a development impact fee for such site has previously been paid....

The City's powers signed away by the mayors in these Agreements does not rise to the level of invoking the federal constitution, but the City, through its legislature, has the authorization to create development policies and enact such fees that would reasonably achieve the City's policies. The special fee levy and the waiver of all other fees listed in the Agreements, as those provisions currently stand, directly interfere with the City's municipal corporate powers. As a result, the waiver of fees pursuant to the Agreements, not duly enacted by ordinance or categorized under one of the exemptions, are also void.

For the reasons stated, we reverse the decision of the lower court and remand the case at bar to that court for it to enter judgment that the Agreements are *ultra vires* and *void ab initio*. *State Comm'n on Human Relations v. Baltimore City Dep't of Recreation and Parks*, 166 Md.App. 33, 47–48, 887 A.2d 64 (2005)(holding the parties' settlement agreement was void and the subsequent consent judgment unenforceable and the parties had to be restored to their respective status quo positions before the date of the settlement agreement.)

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED AND REMANDED. ON REMAND, COURT IS TO ENTER JUDGMENT CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES RIVER WALK APARTMENTS, LLC AND MONOCACY RIVER APARTMENTS, LLC, SUBSTITUTED PARTIES FOR RIVERSIDE.**